[819 NYS2d 705]

PATRICIA NONNON, Individually and as Executrix of KERRI NON-
NON, Deceased, et al., Respondents, v CITY OF NEW YORK,
Appellant. (And Other Actions.)

First Department, June 6, 2006

**APPEARANCES OF COUNSEL**

*Michael A. Cardozo, Corporation Counsel*, New York City (*Elizabeth S. Natrella, Pamela Seider Dolgow, Christopher G. King, Matthew J. Maiorana* and *Leonard Koerner* of counsel), for appellant.

*Profeta & Eisenstein*, New York City (*Fred R. Profeta, Jr.* of counsel), and *Shandell, Blitz, Blitz & Bookson, LLP*, New York City, for respondents.

**OPINION OF THE COURT**

Mazzarelli, J.P.

In this toxic tort litigation concerning the Pelham Bay landfill, we hold that the reports and findings of the expert epidemiologists and toxicologists satisfy the standard employed in *Frye v United States* (293 F 1013 [DC Cir 1923]), that of general accep-

tance in the scientific community. To hold otherwise would deny redress to these plaintiffs, who are living in an area where they are being systemically poisoned by environmental contaminants, and who have presented sufficient evidence to sustain their burden on summary judgment.

The now inactive 81-acre landfill is owned by the City of New York and was operated by the Department of Sanitation from approximately 1963 until 1979. During that time, it was used to dispose of 2,600 tons of solid waste per day. Over the years, residents made complaints about a number of problems at the landfill, including the improper dumping of hazardous materials, odor emanating from the site, and a yellow mist floating through the air. Residents also claimed that the landfill was illegally receiving industrial wastes, including oil, and carcinogenic liquid and solid wastes from corporations in the area.

There has been much litigation concerning this landfill. In March of 1985, the City commenced an action under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) against 15 corporate defendants. The City claimed that the corporations had illegally disposed of industrial and chemical waste, containing "hazardous substances" within the meaning of CERCLA, at Pelham Bay, and four other landfills. It asserted that the groundwater had become contaminated, was leaching[1] into the surface waters around the landfills, including Jamaica Bay, Eastchester Bay, and Richmond Creek, and was threatening aquifers which are present or potential sources of drinking water for the City's residents. The City sought recovery of the costs it had incurred in attempting to rid the area of toxins, and damages for injury to natural resources which were affected by pollutants (see *City of New York v Exxon Corp.*, 633 F Supp 609 [SD NY 1986]; 697 F Supp 677 [SD NY 1988]; 744 F Supp 474 [SD NY 1990]). As a result of that suit, the City was awarded millions of dollars (see 766 F Supp 177, 197 [SD NY 1991]). In 1983, the Pelham Bay landfill was classified as an "inactive hazardous waste site" by the New York State Department of Environmental Conservation. This classification means that a significant threat to the public health or environment exists, and that action is required.

Thereafter, in 1985, in response to complaints about dangerous leachate streams and ponds by individuals living in the

---

**1.** Leaching is a process whereby substances dissolve into rainfall, melting snow, or dew and travel with the liquid. As relevant here, leachate can carry contaminants from hazardous substances present in the landfill to the underlying soil and groundwater.

vicinity of the landfill, the City Department of Sanitation (DOS) signed a consent decree with the State Department of Environmental Conservation (DEC). It admitted that it had allowed leachate to enter the surface and groundwaters in violation of state and federal standards, and that it had allowed hazardous waste to be illegally disposed at Pelham Bay while it was in operation (see *New York Coastal Fishermen's Assn. v New York City Dept. of Sanitation*, 772 F Supp 162, 163 [SD NY 1991]). The 1985 consent decree required DOS to submit temporary and permanent leachate management plans to the DEC. However, DOS did not comply with the 1985 decree and, as a result, in April 1990 DOS and DEC entered into a second consent decree. This required completion of a remedial plan for cleanup of the Pelham Bay landfill by 1995.

During this time, it became public that hazardous waste was being dumped in this highly populated area. As a result, starting in the early 1980s, local citizens formed an organization called the Pelham Bay Task Force, and an adjunct Scientific Advisory Committee (SAC). The purposes of SAC and the Task Force were to put pressure on the City to evaluate the effect of the hazardous landfill on their community.

PROCEDURAL HISTORY

This appeal concerns nine lawsuits brought against the City between 1991 and 1993 by residents of the Bronx neighborhoods closest to the landfill. Those neighborhoods include: Country Club, Pelham Bay, Spencer Estates, and City Island. In these actions, plaintiffs allege that extended exposure to hazardous substances emanating from the landfill caused the development of either acute lymphoid leukemia or Hodgkin's disease. The actions were commenced separately, and subsequently consolidated for purposes of the City's motion to dismiss. They include: (1) *Nonnon v City of New York*;[2] (2) *Simp-*

---

**2.** The *Nonnon* action was commenced on January 15, 1991. It consists of claims by the following plaintiffs: (1) Patricia Nonnon, individually and as administratrix of the estate of Kerri Nonnon, Joan Kohn, individually and as administratrix of the estate of Danielle Maglio who was diagnosed with leukemia in April 1984 and died on March 7, 1991; (2) Christopher Angelilli, who was born on July 17, 1971 and diagnosed with cancer in July 1980; (3) Theresa Sebastian, individually and on behalf of her infant daughter, Rita Sebastian, who was born on September 7, 1979 and diagnosed with leukemia in November 1982 (Rita turned 18 on September 7, 1997); (4) Justin Zeitlin, who was born October 27, 1983, diagnosed with leukemia on February 7, 1989, and died on August 12, 1993, by his mother Susan Zeitlin, and Susan Zeitlin individually; and (5) Angela DaBenigno, individually and as administratrix of the estates of: (a) Patricia Ann DaBenigno, who was born on August 25, 1948,

son v City of New York;[3] (3) *Irizarry v City of New York*;[4] (4) *Carollo v City of New York*;[5] (5) *Walsh v City of New York*;[6] (6) *Arisio v City of New York*;[7] (7) *Parmigiano v City of New York*;[8] (8) *Phillips v City of New York*;[9] and (9) *Nessen v City of New York*.[10] There were 29 plaintiffs in the original nine actions. All claim that the City's negligence in subjecting them to extended exposure to dangerous levels of carcinogens has proximately caused them injury and/or death.

The City moved to dismiss the claims of 13[11] plaintiffs as time-barred, and it sought to dismiss all nine actions for failure

diagnosed with cancer on December 1988 and died on July 20, 1989; and (b) Joanne Marie DaBenigno, who was born on August 25, 1960, diagnosed with cancer in July 1984 and died on September 24, 1989.

**3.** The *Simpson* action was commenced on February 25, 1992. James Simpson and Kathleen Simpson brought the lawsuit on behalf of their infant son Kevin, who was born on September 18, 1987 and diagnosed with leukemia on April 3, 1991.

**4.** The *Irizarry* action was commenced on November 12, 1992. Sandra Irizarry brought the action on behalf of her infant son Rufino Irizarry, who was born on January 2, 1985 and diagnosed with leukemia on April 2, 1991. She also asserted claims on her own behalf.

**5.** The *Carollo* action was commenced on November 18, 1992. Maria Carollo brought the suit on behalf of her infant son Antonio Carollo, who was born on June 29, 1989 and diagnosed with leukemia on June 25, 1991. Ms. Carollo also asserted claims on her own behalf.

**6.** The *Walsh* action was commenced on November 18, 1992. James Walsh brought the suit on behalf of his son Brian, who was born on January 23, 1975 and diagnosed with Hodgkin's disease in January 1992. Mr. Walsh also asserted individual claims. Brian turned 18 on January 23, 1993.

**7.** The *Arisio* action was commenced on December 29, 1992. This case was brought on behalf of the infant plaintiff Amanda Arisio by her mother Leisa Arisio. Amanda was born on March 6, 1987 and diagnosed with leukemia in May 1990. Leisa Arisio also asserts claims on her own behalf.

**8.** The *Parmigiano* action was commenced on February 3, 1993. Nicholas Parmigiano brought the action on behalf of his infant daughter Maria Nicole Parmigiano, who was born on December 14, 1974 and diagnosed with leukemia on June 22, 1989. Mr. Parmigiano also asserted claims on his own behalf. Maria turned 18 on December 14, 1992.

**9.** *Phillips v City of New York* was commenced on May 13, 1993. This action was brought on behalf of the infant plaintiff Michelle Phillips, who was diagnosed with leukemia on March 6, 1990, by her mother Rosemarie Phillips. Rosemarie Phillips also asserted individual claims.

**10.** *Nessen v City of New York* was commenced on May 17, 1993. This action was brought on behalf of the infant plaintiff Jennifer Nessen, who was diagnosed with Hodgkin's disease on February 23, 1987, by her mother Rosalie Nessen. Rosalie Nessen also asserted claims on her own behalf. Jennifer turned 18 years old on October 2, 1994.

**11.** The City argued that the individual claims of plaintiffs Christopher Angelilli, Leisa Arisio, Sandra Irizarry, Joan Kohn, Rosalie Nessen, Patricia

to state a cause of action. It was the City's position that plaintiffs failed to allege a viable causal connection between the city landfill and plaintiffs' cancer. In support of the argument that all of the actions should be dismissed, the City submitted a 1988 study conducted by its Department of Health, specifically the Environmental Epidemiology Unit, within the Division of Community and Occupational Health. The study, entitled "An Evaluation of Childhood Leukemia in the Pelham Bay Area of the Bronx," was prompted by residents' concern that the Pelham Bay landfill may have caused elevated disease rates in the surrounding population. The study analyzed all types of leukemia in the Pelham Bay area, as reported to the New York State Cancer Registry from 1974 to 1985. That study concluded that there was no evidence of an increased incidence of childhood leukemia during this period as compared to the incidence rates of childhood leukemias in the rest of the city.

Also submitted by the City was a second Department of Health study conducted in 1994, and an addendum to that report dated 1996. The second study, which was based upon cancer cases reported to the State Department of Health Cancer Registry from 1978 to 1987, examined rates for all types of cancer combined and for 13 specific types of cancer in adults and three types of cancer in children. The City's 1994 study found that for the diseases it studied in both adults and children in the Pelham Bay area cancer rates generally were consistent with such rates for the rest of the city.

The City also proffered an October 5, 1994 affidavit of Dr. Richard Neugebauer, an epidemiologist. Dr. Neugebauer had been retained by the City as an epidemiological consultant, to study the environmental effects that two landfills (Fresh Kills and Brookfield Avenue) may have had on the citizens of Staten Island. In that affidavit, Dr. Neugebauer stated:

> "[t]he hypothesis that the scientific community is using is that toxic compounds released into the environment by the [two Staten Island landfills] ha[ve] caused and [are] causing an increased rate of cancer and other illnesses among residents living in proximity [thereto]. This hypothesis is based on the

Nonnon, Nicholas Parmigiano, Rosemarie Phillips, Theresa Sebastian, and Susan Zeitlin were time-barred. It sought dismissal of the claims of Angela DaBenigno, individually, and as administratrix of the estates of Joanne Marie DaBenigno and Patricia Ann DaBenigno, on the same basis.

evidence supplied by area residents, medical evidence from physicians treating these residents and by an extensive body of scientific information linking the chemical compounds in the dumps with harmful effects on human health."

Dr. Neugebauer concluded that:

"it is not possible to arrive at any scientific conclusions yet[, despite the fact that] the volume of hazardous chemicals known to have been placed [at two Staten Island landfills] and the close proximity of [those landfills] to residential populations affords a strong a priori grounds [*sic*] for hypothesizing that these populations are showing increased rates of cancer and other illnesses."

The City contends that this affidavit precludes a finding that hazardous materials in the Pelham Bay landfill caused plaintiffs' injuries.

In opposition, plaintiffs submitted affidavits from: Jesse Bidanset, a forensic toxicologist; Dr. Diane Trainor, an ecotoxicologist and expert in industrial hygiene; Dr. Philip Lanzkowsky, a pediatric hematologist and oncologist; and the same Dr. Neugebauer.

Dr. Bidanset reviewed the reported illegal dumping of toxic substances at the landfill and the history of its operation. He also reviewed a public health assessment of the Pelham Bay landfill conducted by the State DOH, and published in February 2000, as well as a number of general studies concerning chemicals emanating from landfill sites. In his affidavit, Dr. Bidanset observed that the City Department of Sanitation had failed to control the material that was being dumped into the landfill, allowing human sewage, industrial waste, toxic waste, and products which were known "human carcinogens" to be deposited there. An appendix to Dr. Bidanset's affidavit lists 59 hazardous chemicals found at the landfill. At least 14 of those chemicals are included in the federal Environmental Protection Agency's list of "hazardous substances" (40 CFR 116.4). In addition, two chemicals identified by Dr. Bidanset in the landfill, trichloroethylene (TCE) and tetrachloroethylene, are industrial solvents which have been linked to acute lymphoid leukemia (ALL), the exact form of leukemia developed in the majority of

the plaintiffs in this lawsuit.[12] Dr. Bidanset affirmed that the TCE and other toxins he found existed "at concentrations exceeding workplace standards, environmental standards, and ground water standards." He faulted the City for failing to cover the landfill with a semipermeable membrane, which would have controlled the release of hazardous gases, and for failing to use an interceptor, which would have collected and directed leachate to appropriate facilities. Dr. Bidanset opined that:

"to a reasonable degree of toxicological certainty . . . the presence of known carcinogens emanating from [the landfill] in the form of landfill gases, leachate, groundwater contamination and soil contamination ha[s] been a cause of a greater than usual cancer, leukemia, and Hodgkin's disease rate among neighbors to the landfill site."

Plaintiffs next offered the affidavit of Dr. Diane Trainor, a toxicologist and occupational and environmental safety and health expert. Dr. Trainor reviewed the documents provided by the City in discovery. She identified various "exposure pathways" through which nine known carcinogens could endanger residents of the areas near the landfill. These pathways included: (1) the surface water of Eastchester Bay, where residents would fish and swim; (2) groundwater which contaminated neighboring soil and local vegetables; (3) leachate flowing into neighboring soil and into Eastchester Bay; and (4) air emissions. Dr. Trainor affirmed that "there is an abundance of research conclusively supporting the association between low level exposures to toxic substances and the development of diseases including leukemia and cancer" and she noted that "epidemiological data . . . supports the conclusion that people in the surrounding areas to [the landfill] have an increased level of leukemia and cancer." In conclusion, Dr. Trainor stated:

"After my review of the history of the disposal activities, the confirmed disposal of toxic materials, and my knowledge of health effects associated with exposure to these toxic substances, it is my opinion to a reasonable degree of environmental health certainty that diseases found in the plaintiffs in this

---

**12.** *See Anderson v W.R. Grace & Co.*, 628 F Supp 1219 (D Mass 1986) (action concerning ALL "cancer clusters" allegedly caused by trichloroethylene and tetrachloroethylene in water supply caused by industrial pollution in Woburn, Massachusetts).

case were caused by their exposure to the dump and its by-products. To further exacerbate the situation, the DOS did not provide proper protection to the community in failing to control access to the working face of the landfill. Not only were residents, including the plaintiffs, allowed to walk onto and around the landfill to fish and swim, they were allowed to use the adjacent land for growing vegetables for their own consumption."

Dr. Neugebauer, who had now become plaintiffs' expert, provided an affidavit. In that 2002 document, he stated that he had examined the methods and data used by the City Department of Health in conducting its 1988[13] and 1994[14] studies. These studies had been done to address concerns that cancer clusters near the Pelham Bay landfill were caused by toxic materials from that site, and had found no elevated rates of childhood leukemia in the population adjacent to the landfill.

Dr. Neugebauer stated that these studies had been submitted for review by two independent scientific groups: the Pelham Bay Task Force Scientific Advisory Committee and the members of the New York State Cancer Surveillance Program. A SAC report, which is in the record, contains a number of criticisms of the City's studies regarding the harmful effects of carcinogens in the Pelham Bay landfill. It notes that the City's studies: (1) do not account for the significant latency periods, which can extend from 5 to 50 years and average 20 years, between exposure to a carcinogen and the time that cancer can be medically detected; (2) fail to examine all relevant cancer subtypes, notably acute lymphoid leukemia; and (3) use the "questionable practice" of adjusting for racial differences according to census data for the populations being compared.[15]

Dr. Neugebauer also described a study he himself conducted of the incidence of acute lymphoid leukemia for the period 1980 to 1996 among children in the area. Dr. Neugebauer's team examined rates of this type of cancer in four concentric bands ranging from within 8,000 feet of the landfill to over 20,000 feet

---

**13.** The City's 1988 study covered the period between 1974 and 1985.

**14.** The City's 1994 study covered the period between 1978 and 1987.

**15.** The City's 1994 study population was obtained from census data, which classifies individuals into mutually exclusive groups for race/ethnicity: white non-hispanic; white hispanic; black non-hispanic; and black hispanic. The City's study divided individuals into the following four categories: white non-hispanic; black non-hispanic; hispanic; and other. It is unclear how individuals were assigned to these groups.

from the site. The data was compared to census data for the years 1980, 1990 and 2000 for the population of New York City. Dr. Neugebauer concluded that the rate of acute lymphoid leukemia for the period 1988 to 1996 among children living closest to the landfill (band 1) was 3.4 times higher than the rate among children living furthest from the landfill.

Dr. Neugebauer also opined that,

"[a]fter careful review of the City's reports and their criticisms, and careful attention paid to correct the errors made by the City in our current study I can reach only one conclusion. The Pelham Bay Landfill is to a reasonable degree of epidemiological certainty a cause of the increased rates of childhood acute lymphoid leukemia among the area residents. Further, to a reasonable degree of epidemiological certainty the [landfill] was a substantial contributing factor to the acute lymphoid leukemia that occurred in the plaintiffs in this lawsuit."

Plaintiffs also submitted an affirmation from a pediatric hematologist and oncologist, Dr. Lanzkowsky. He stated that "it has been known for almost half a century that benzene [one of the toxins found in the landfill] is associated with bone marrow toxicity and that it plays a causative role in Leukemia."

In reply, the City presented the affidavit of Dr. Borak, an epidemiologist. Dr. Borak described how Dr. Neugebauer's study differed from the City's prior studies, and he concluded that Dr. Neugebauer's failure to adjust for race/ethnicity differences caused substantial confounding which biased the findings. Dr. Borak provided a bibliography, which cited studies purportedly showing that acute lymphoid leukemia is more prevalent in white children than black children, and he noted that the population in the bands closest to the landfill had a higher percentage of white children. Dr. Borak concluded that Dr. Neugebauer's failure to consider this confounding factor compromised the validity of his conclusions.

Dr. Borak also challenged the Trainor and Bidanset affidavits, stating Dr. Trainor did not follow the general toxicological practice of examining the specific exposure dose to determine causation. Dr. Borak noted that although Dr. Bidanset provided a list of the carcinogens which Dr. Bidanset asserted "were present at concentrations which exceeded work place standards, environmental standards, and ground water standards," the failure to quantify the level of any specific carcinogen was fatal

to concluding that plaintiffs' cancers were caused by hazardous materials at the dump.

## IAS COURT'S DECISION

The IAS court granted the City's motion to dismiss certain of the claims as time-barred.[16] Plaintiffs further conceded, and the court dismissed, the claims related to the DaBenigno sisters, for failure to establish a causal connection between their deaths and the landfill. However, the court determined that the complaint of Christopher Angelilli[17] was not time-barred, and it denied the City's motion to dismiss the claims of the remaining plaintiffs for lack of merit.

## APPELLATE CONTENTIONS

On appeal, the City argues that the scientific methodology employed by plaintiffs' experts was insufficient to establish that plaintiffs' cancer was caused by exposure to the landfill. In the alternative, the City seeks a remand for a *Frye* hearing. The City also claims that the IAS court erroneously failed to dismiss the claim of plaintiffs Angelilli, Brian Walsh, Jennifer Nessen, and Maria Parmigiano as time-barred.

Plaintiffs counter that the scientific methodology employed by their experts is a generally accepted manner of establishing causation of diseases in the community, and that their submissions were sufficient to defeat the City's motion to dismiss the action. Plaintiffs additionally assert that the City's statute of limitations arguments should be rejected.

## THE APPLICABLE LAW

New York follows the rule set forth in *Frye* (293 F at 1014) that the proponent of scientific evidence must establish that the theory and method used by a particular witness is generally accepted in the scientific community. In *Frye*, a criminal defendant sought to corroborate exculpatory statements with the results of a "systolic blood pressure deception" test, now commonly referred to as a polygraph or "lie detector" test (*id.*). The District of Columbia Court of Appeals excluded the evidence, because the test had not gained "general acceptance" among the authorities in the fields of physiology and psychology (*id.*). The court stated:

---

16. Plaintiffs did not oppose the dismissal of the claims of Leisa Arisio, Sandra Irizarry, Joan Kohn, Rosalie Nessen, Patricia Nonnon, Nicholas Parmigiano, Rosemarie Phillips, Theresa Sebastian, and Susan Zeitlin as untimely.

17. Angelilli was born on July 17, 1971. He was diagnosed with ALL in July 1980. He filed his notice of claim on January 18, 1990, six months after his eighteenth birthday.

"[j]ust when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (*Id.*)

Thus, under the rule articulated in *Frye*, the proponent of "novel science" must establish its general acceptance among scientists within the pertinent discipline to justify its admission.

Since 1923, New York State courts[18] have applied the *Frye* test in a variety of contexts for the important purpose of screening "novel scientific evidence" to determine whether it is "experimental," and therefore inadmissable; or "demonstrable," and therefore competent. Some cases have involved physical phenomena and measurements (*see People v Angelo*, 88 NY2d 217 [1996] [polygraph test results not generally accepted by the pertinent scientific community]; *People v Wesley*, 83 NY2d 417, 422 [1994] [DNA evidence considered admissible]; *People v Hughes*, 59 NY2d 523, 537 [1983] [posthypnotic recollection testimony not admissible under *Frye*]; *Styles v General Motors Corp.*, 20 AD3d 338 [2005] [novel use of combination of two accepted automobile roof stress tests subject to *Frye* hearing to determine admissibility]).

Courts have also applied *Frye* to novel psychological theories and to physical hypotheses (*People v Wernick*, 89 NY2d 111, 115-118 [1996] [expert testimony regarding "neonaticide syndrome" inadmissible because the pattern of behavior, brief

---

**18.** In 1993 the United States Supreme Court decided *Daubert v Merrell Dow Pharmaceuticals, Inc.* (509 US 579 [1993]). *Daubert* held that under Federal Rules of Evidence rule 702, the trial court must assume the role of "gatekeeper" for the admission of expert evidence. To determine whether expert testimony is admissible, all federal courts, and state courts which have adopted the *Daubert* rule, look to a variety of factors including: (1) whether the theory or technique is subjected to peer review and publication; (2) the known or potential rate of error; (3) whether the theory can be and has been tested; and (4) whether there is "general acceptance" of the opinion or technique in the relevant scientific community. New York State has not adopted the *Daubert* rule. Accordingly, the *Frye* standard governs the admissibility of expert testimony in this case.

reactive psychosis which causes a mother to kill a newborn, is not generally recognized in the relevant medical community]; *People v Taylor*, 75 NY2d 277 [1990] [expert testimony describing "rape trauma syndrome" admissible to explain behavior which may appear unusual to a lay juror not familiar with patterns of response exhibited by rape victims and recognized by medical experts in the field]; *Lewin v County of Suffolk*, 18 AD3d 621 [2005] [hypothesis that in utero exposure to pesticide Malathion causes birth defects not generally accepted in the medical and scientific community]; *Lara v New York City Health & Hosps. Corp.*, 305 AD2d 106 [2003] [expert's theory that a precipitous delivery with slow bleeding can cause infant to suffer from cerebral palsy not generally accepted in the relevant community]; *Selig v Pfizer, Inc.*, 290 AD2d 319 [2002], *lv denied* 98 NY2d 603 [2002] [plaintiff's expert hypothesis that Viagra causes heart attacks in men with preexisting cardiac conditions is not generally accepted in the pertinent medical community]).

In this case, neither the deductions of the expert epidemiologists and toxicologists, nor the methodologies employed by them, in reaching their conclusions is premised on the type of "novel science" implicating the concerns articulated in *Frye*. For example, in *Marsh v Smyth* (12 AD3d 307 [2004]), this Court reversed a motion court's *Frye* ruling. At issue was the testimony of two medical experts, who averred that plaintiff's arm was improperly positioned during a surgical procedure, causing "long thoracic nerve palsy." (*Id.*) The motion court disallowed the testimony, finding that the experts' conclusions were not accepted in the field. We reversed, holding that *Frye* is not concerned with the reliability of a certain expert's conclusions, but instead with "whether the experts' deductions are based on principles that are sufficiently established to have gained general acceptance as reliable" (*id.* at 308; *see also Lustenring v AC&S, Inc.*, 13 AD3d 69 [2004], *lv denied* 4 NY3d 708 [2005] [defendant's factual disagreement with plaintiff's theory that workplace exposure to asbestos caused mesothelioma did not require *Frye* hearing]).

Citing Chief Judge Kaye's concurrence in *People v Wesley* (83 NY2d at 436), the dissent faults the experts' opinions for lacking a proper foundation. *Wesley* concerned DNA evidence, and in her concurrence, Chief Judge Kaye cautioned that the fact that the procedure for matching DNA, known as Restriction Fragment Length Polymorphic (RFLP) procedure, had gained scientific acceptance did not relieve the court from determining

whether there was a proper foundation for the DNA results at issue by ascertaining whether "the laboratory actually employed the accepted [RFLP] techniques" (*id.*).

Here, plaintiffs' experts laid a proper foundation for the introduction of their opinions. They followed generally accepted methods for the collection and analysis of evidence and applied proper techniques to reach their conclusions. The dissent seeks to dismiss plaintiffs' evidence by calling it "fuzzy science at its worst," because these experts, according to the dissent, failed to measure plaintiffs' level of exposure to the toxins in question. However, if the dissent had its way, nearly all plaintiffs suffering the ill effects, some lethal, of environmental contaminants would be barred from obtaining redress from those responsible. Here, Dr. Neugebauer, one of the expert epidemiologists, analyzed two studies performed by city experts, and he conducted his own study to determine whether there was an increased incidence of acute lymphoid leukemia in the area closest to the Pelham Bay landfill. While the City's studies and Dr. Neugebauer's study came to opposite conclusions, the methodology used in conducting the epidemiological studies was in strict conformity with the dictates of this field of science and the studies are properly admissible evidence.

Epidemiology itself is certainly not novel. It is defined as "(1) a branch of medical science that deals with the incidence, distribution, and control of disease in a population; [or] (2) the sum of the factors controlling the presence or absence of a disease or pathogen" (Merriam Webster's Collegiate Dictionary 389 [11th ed [2003]). It is a science which "focuses on the question of general causation (i.e., is the [landfill] capable of causing disease?) rather than that of specific causation (i.e., did [the landfill] cause disease in a particular individual?)" (Federal Judicial Center, Reference Manual on Scientific Evidence, Reference Guide on Epidemiology, at 336 [2d ed 2000]). Epidemiological studies, such as those conducted by the City and plaintiffs, are similarly not novel. In addition, numerous courts have held that this field of science is " 'the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or a disease' " (*Soldo v Sandoz Pharmaceuticals Corp.*, 244 F Supp 2d 434, 532 [WD Pa 2003] [citations omitted]; *Castillo v E.I. Du Pont De Nemours & Co., Inc.*, 854 So 2d 1264, 1270 [Fla Sup Ct 2003]; *see Arnold v Dow Chem. Co.*, 32 F Supp 2d 584 [ED NY 1999]; *Conde v Velsicol Chem. Corp.*, 804 F Supp 972, 1025-1026 [SD Ohio 1992],

*affd* 24 F3d 809 [1994]). At least one court has noted that "epidemiological evidence is indispensable in toxic and carcinogenic tort actions where direct proof of causation is lacking" (*In re Joint E. & S. Dist. Asbestos Litig.*, 52 F3d 1124, 1128 [1995]).

Plaintiffs' toxicological evidence is similarly admissible without a *Frye* hearing. Toxicology is likewise not a novel field of science. Rather, "classically [it] is known as the science of poisons" (Reference Manual on Scientific Evidence, Reference Guide on Toxicology, at 403 [2d ed]). In fact, the City's argument is not that the field is novel, but that plaintiffs' toxicological submissions fail to show causation because they do not give a specific dose-response relationship[19] between the carcinogens in the landfill and plaintiffs' cancers.

Citing *Parker v Mobil Oil Corp.* (16 AD3d 648 [2005], *lv granted* 6 NY3d 702 [2005]), a case involving an individual plaintiff who claimed that exposure to benzene on the job caused him to contract acute myelogenous leukemia (AML), the dissent adopts the City's argument. In *Parker*, the Second Department dismissed the action because the plaintiff's experts (from unidentified fields) did not quantify the level of benzene to which plaintiff had been exposed on the job, or provide the dose-response relationship between benzene and AML.

The holding in that case cannot be applied to the facts here because no scientist could make an accurate measurement of the doses of the combined carcinogens to which these plaintiffs were exposed. The federal reference manual instructs that "dose-response" relationships are only one of nine factors which can lead an epidemiologist to draw a causal inference (Reference Manual on Scientific Evidence, *supra* at 374-379). It is not the dispositive measure here.

Instead, Dr. Neugebauer conducted a study following proper epidemiological methods, and after comparing his results with other studies and expert opinions, he concluded that there was a causal connection between the Pelham Bay landfill and plaintiffs' cancers. It was a proper exercise of the IAS court's discretion to allow the introduction of his conclusions, subject

---

**19.** Dose-response relationships are defined as
"[t]he extent to which a living organism responds to specific doses of a toxic substance. The more time spent in contact with a toxic substance, or the higher the dose, the greater the organism's response. For example, a small dose of carbon-monoxide will cause drowsiness; a large dose can be fatal" (Reference Manual on Scientific Evidence, *supra* at 433).

to cross-examination, and subject to the introduction of the City's expert findings which came to opposite conclusions.

It also bears noting that in *Annunziato v City of New York* (224 AD2d 31 [1996]), an action was dismissed upon Dr. Neugebauer's conclusion that any alleged link between the Staten Island landfill and plaintiffs' cancers was still in the hypothetical stage. As discussed, supra, epidemiological reports, such as those submitted in this case, are essential to proving medical causation in toxic tort cases (*In re Joint E. & S. Dist. Asbestos Litig., supra*). Dr. Neugebauer and other experts completed epidemiological reports, some concluding there was a causal connection between the landfill and plaintiffs' cancers, and others coming to a conclusion that a causal link had not been established. Dr. Neugebauer's opinion was based upon a statistically significant increase in incidence of the type of cancers suffered by plaintiffs in the area closest to the hazardous site. As discussed, the specific methodologies of the experts and the validity of their conclusions are subjects for trial, and not a basis for summary disposition of the action.

Unlike *Parker*, this case does not involve one plaintiff alleging that exposure to one carcinogen from one source caused cancer. This litigation arose from a community with a disproportionate incidence of fatal cancers in an area surrounding a landfill containing approximately one million gallons of hazardous waste. It is uncontested that defendant allowed years of illegal dumping of what are known to be carcinogens at the Pelham Bay landfill, and one of plaintiffs' experts identified four "exposure pathways" through which these plaintiffs could have been "poisoned" by the dumped carcinogens. It is uncontested that the landfill was closed because it contained unacceptable levels of carcinogens. Proper methods of containing the spread of hazardous materials through a variety of exposure pathways were concededly not implemented.

The City also cites *Wills v Amerada Hess Corp.* (2002 WL 140542, 2002 US Dist LEXIS 1546 [SD NY 2002], *affd* 379 F3d 32 [2004], *cert denied* — US —, 126 S Ct 355 [2005]) in support of dismissal. However, like *Parker, Wills* is distinguishable from this case on the law and the facts. In fact, *Wills* is similar only in that Dr. Bidanset appeared as an expert toxicologist in both cases, and that the plaintiffs in both cases developed cancer. In *Wills*, the decedent was a seaman on one of the defendant's ships. He died of squamous cell carcinoma of the head and neck, which the plaintiff claimed was caused by exposure to carcino-

gens which were present on the ship. The District Court was critical of Dr. Bidanset for first espousing a dose-response relationship between the decedent's exposure to hyrdocarbons and his development of squamous cell carcinoma of the head and neck, and then failing to quantify exposure levels or otherwise substantiate the causal threshold or connection. Notably, at his deposition in *Wills*, Dr. Bidanset admitted that smoking and drinking are the largest risk factors for squamous cell carcinoma, and that the decedent was a heavy cigarette smoker and consumed moderate amounts of alcohol. After a hearing under *Daubert*, the District Court determined to exclude Dr. Bidanset's opinions. It granted defendant summary judgment, subject to the right of the plaintiff to file an affidavit seeking additional discovery relevant to her theory of causation.

By contrast to *Wills*, this action concerns a number of plaintiffs, all of whom live near the Pelham Bay landfill, who developed either acute lymphoid leukemia or Hodgkin's disease. The record contains epidemiological reports from both plaintiffs and the City, with differing conclusions about whether the incidence of cancer was high in the area closest to the landfill. Further, there is significant evidence that these plaintiffs were exposed to a variety of carcinogens, over an extended period of time, through a variety of exposure pathways. It is not surprising that plaintiffs' toxicologists did not present a specific dose-response threshold of any particular carcinogen to support their opinions that plaintiffs' cancer was caused by exposure to the landfill. Neither Dr. Bidanset nor plaintiffs' other expert toxicologist purported to establish a dose-response relationship between the large number of carcinogens in the landfill for over a decade and plaintiffs' cancers. Instead, plaintiffs have proffered a combination of epidemiological and toxicological reports to support the theory that their extended exposure to hazardous levels of numerous carcinogens in this particular landfill caused their cancers (*cf. Parker, supra* [no studies submitted which opined that plaintiff's occupational exposure to benzene caused his cancer]). Moreover, Dr. Trainor, one of plaintiffs' experts, identified at least four pathways (leachate, groundwater, soil, and air emissions) by which plaintiffs, and other individuals in proximity to the landfill, could have been exposed to those carcinogens.

In fact, both plaintiffs and the City rely on epidemiological studies in support of their positions, and the parties even share reliance on the opinion of a mutual expert, Dr. Neugebauer. To

the extent that the City challenges the methodology of Dr. Neugebauer's study, which found an increased incidence of acute lymphoid leukemia in the population in closest proximity to the landfill, and the failure to account for racial distribution, these issues are properly the subject of cross-examination at trial, as they go to credibility and to the weight to be given to the evidence (*Wesley*, 83 NY2d 417, 426-427 [1994]; *see Gayle v Port Auth. of N.Y. & N.J.*, 6 AD3d 183, 184 [2004]). Similarly, plaintiffs' experts are properly subject to cross-examination, and the substance of their reports a proper subject for questioning. However, as neither the epidemiological reports nor the toxicological submissions concern "novel science," *Frye's* concerns are not implicated and no pretrial hearing was required.

STATUTE OF LIMITATIONS

■ The City finally argues that the claims of all of the plaintiffs, except Amanda Arisio, Antonio Carollo, Rufino Irizarry, Michelle Phillips, and Kevin Simpson, should be dismissed as untimely. Plaintiffs conceded that the claims of Leisa Arisio, Sandra Irizarry, Joan Kohn, Rosalie Nessen, Patricia Nonnon, Nicholas Parmigiano, Rosemarie Phillips, Theresa Sebastian and Susan Zeitlin were untimely, and that these claims were appropriately dismissed. Also, plaintiffs conceded that Angela DaBenigno's claims: (1) for loss of services; and (2) on behalf of Patricia Ann DaBenigno and Joanne Marie DaBenigno, for wrongful death, were subject to dismissal for failure to establish a causal connection to the landfill.

However, in opposition to the City's motion, plaintiffs asserted that Christopher Angelilli's claim was timely, as he was born on July 17, 1971 and diagnosed with childhood leukemia in July 1980. He filed his notice of claim on January 18, 1990, which plaintiffs mistakenly asserted was three months, rather than six months, after his eighteenth birthday. Counsel affirmed that this plaintiff filed his claim within one year of the discovery of the cause of his leukemia under CPLR 214-c.

The accrual date of a claim to recover damages for personal injuries purportedly arising out of exposure to toxic substances is determined by the discovery rule prescribed in CPLR 214-c, which as relevant to claims against a municipality provides:

"3. For the purposes of sections fifty-e and fifty-i of the general municipal law, . . . requiring as a condition precedent to commencement of an action or

special proceeding that a notice of claim be filed or presented within a specified period of time after the claim or action accrued, a claim or action for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property shall be deemed to have accrued on the date of discovery of the injury by the plaintiff or on the date when through the exercise of reasonable diligence the injury should have been discovered, whichever is earlier.

"4. Notwithstanding the provisions of subdivisions two and three of this section, where the discovery of the cause of the injury is alleged to have occurred less than five years after discovery of the injury or when with reasonable diligence such injury should have been discovered, whichever is earlier, an action may be commenced or a claim filed within one year of such discovery of the cause of the injury; provided, however, if any such action is commenced or claim filed after the period in which it would otherwise have been authorized pursuant to subdivision two or three of this section the plaintiff or claimant shall be required to allege and prove that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to the expiration of the period within which the action or claim would have been authorized and that he has otherwise satisfied the requirements of subdivisions two and three of this section."

The City argues that Angelilli's action is time-barred because his suit was not commenced until January 15, 1991, more than one year and 90 days after his 18th birthday on July 17, 1989. Angelilli responds that his complaint was timely filed pursuant to CPLR 214-c (4) within one year of his first learning that the landfill was the cause of his cancer. However, he fails to allege, as required by that section, "that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to the expiration of the [statute of limitations on October 17, 1990]" (*see Annunziato*, 224 AD2d at 38). As such, plaintiff Angelilli's complaint should be dismissed with leave to replead.

Because the remaining plaintiffs in this case have presented proof that they learned, within five years after their illnesses had been diagnosed, that harmful substances at the landfill were responsible for their illnesses, their claims are not time-barred (*cf. Annunziato, supra*).

Accordingly, the order of the Supreme Court, Bronx County (Alexander W. Hunter, Jr., J.), entered October 16, 2003, which, in actions for personal injuries and wrongful death allegedly caused by exposure to toxic substances in a landfill, inter alia, denied defendant City of New York's motion to dismiss all of the complaints for lack of merit and certain of the complaints as time-barred, should be modified, on the law, to dismiss, with leave to replead, plaintiff Angelilli's complaint, and otherwise affirmed, without costs.

ANDRIAS, J. (dissenting). It is axiomatic that plaintiffs in a toxic tort action must prove that their injuries were caused by defendant's negligence in exposing them to toxic substances. It is also fundamental that, in opposing a motion for summary judgment dismissing a complaint for failure to state a cause of action, plaintiffs must, in nonconclusory fashion, make out a prima facie case and raise a triable factual issue. Plaintiffs have attempted to do so through expert opinion.

Because plaintiffs' epidemiological and toxicological experts failed to use generally accepted scientific methodology, their opinions that the Pelham Bay landfill was a substantial contributing factor to the acute lymphoid leukemia that occurred in all but two of the plaintiffs lacked a proper foundation and was therefore inadmissible as evidence. For that reason, as well as plaintiffs' failure to present any evidence establishing a causal relationship between the toxic substances deposited in the landfill over the years and the acute lymphoid leukemia or, in two instances, Hodgkin's disease, from which they suffered, the City's motion for summary judgment dismissing these actions should have been granted.

The long-recognized rule of *Frye v United States* (293 F 1013 [DC Cir 1923]), as interpreted by the Court of Appeals in *People v Wesley* (83 NY2d 417 [1994]), requires that expert testimony be based upon a scientific principle or procedure which has been "sufficiently established to have gained general acceptance in the particular field in which it belongs" (*id.* at 423, quoting *Frye, supra* at 1014 [emphasis omitted]). "The *Frye* 'general acceptance' test is intended to 'protect[ ] juries from being misled by expert opinions that may be couched in formidable scientific

terminology but that are based on fanciful theories' " (*Styles v General Motors Corp.*, 20 AD3d 338, 342 [2005, Catterson, J., concurring] [citation omitted]). While novel scientific evidence requires a determination as to its reliability (*Wesley,* 83 NY2d 422), even where *Frye* has been satisfied or the scientific evidence is not novel, the admissibility of the specific evidence remains to be determined. The burden of establishing admissibility rests on the proponent of the expert opinion.

> "Once *Frye* has been satisfied, the question is 'whether the accepted techniques were employed by the experts in this case' (*People v Middleton,* 54 NY2d [42,] 50). The focus moves from the general reliability concerns of *Frye* to the specific reliability of the procedures followed to generate the evidence proffered and whether they establish a foundation for the reception of the evidence at trial. The trial court determines, as a preliminary matter of law, whether an adequate foundation for the admissibility of this particular evidence has been established" (*Wesley,* 83 NY2d at 429).

Here, in denying the City's summary judgment motion to dismiss the complaints on statute of limitations grounds and for failure to state a cause of action, the motion court failed to determine whether the opinions of plaintiffs' experts, that there is a high probability that plaintiffs' illnesses were caused by their continued and prolonged exposure to the Pelham Bay landfill, satisfy the requisite standard for admissibility. Indeed, the court improperly shifted the burden of proof to the City when it found that the City had not provided "any evidence to indicate that the plaintiffs did not get their diseases from the landfill." (1 Misc 3d 897, 899 [2003].) The court compounded its error when it further found that the City offered no evidence in support of its assertion that plaintiffs have been unable to assert a causal connection between the landfill and their diseases.

The question here is not whether epidemiology or toxicology are novel sciences, but whether the opinions of plaintiffs' experts, that there was a causal connection between plaintiffs' alleged exposure to hazardous materials in the Pelham Bay landfill and plaintiffs' acute lymphoid leukemia and Hodgkin's disease, are based upon generally accepted techniques within their disciplines. " '[G]eneral acceptance does not necessarily mean that a majority of the scientists involved subscribe to the conclusion. Rather it means that those espousing the theory or

opinion have followed generally accepted scientific principles and methodology in evaluating clinical data to reach their conclusions' " (*Zito v Zabarsky*, 28 AD3d 42, 44 [2006]). Moreover, whether we are dealing with scientific evidence or not, where an expert cites no authority, treatise, standard, article, or other corroborating evidence to support his assertions and "the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation . . . the opinion should be given no probative force and is insufficient to withstand summary judgment" (*Buchholz v Trump 767 Fifth Ave., LLC*, 5 NY3d 1, 9 [2005] [citation omitted]).

As recognized by the Second Department in *Parker v Mobil Oil Corp.* (16 AD3d 648, 651 [2005], *lv granted* 6 NY3d 702 [2005]), "although federal courts use the broader *Daubert* test (*see Daubert v Merrell Dow Pharms.*, 509 US 579 [1993]) instead of the *Frye* standard (*see Frye v United States, supra*) in connection with determining the admissibility of scientific expert testimony, it is instructive to examine federal authority for purposes of discussion of accepted scientific methodology." One such authority is the Reference Manual on Scientific Evidence (2d ed 2000) published by the Federal Judicial Center, which is intended to assist federal judges in recognizing the characteristics and reasoning of "science" as it is relevant in litigation and to aid them in dealing with such issues. The reference guides in the manual are not intended to instruct judges concerning what evidence should be admissible but are designed to facilitate the process of identifying and narrowing issues concerning scientific evidence by outlining the pivotal issues in the areas of science that are often subject to dispute. Among the scientific areas addressed are epidemiology and toxicology, the sciences relied upon by plaintiffs.

"Epidemiology focuses on the question of general causation (i.e., is the agent capable of causing disease?) rather than that of specific causation (i.e., did it cause disease in a particular individual?)" (Reference Manual on Scientific Evidence, Reference Guide on Epidemiology, at 336]). The authors emphasize that "*an association is not equivalent to causation*" (*id.*). As a final caveat, the authors state that "[e]pidemiology is concerned with the incidence of disease in populations and does not address the question of the cause of an individual's disease. This question, sometimes referred to as specific causation, is beyond the domain of the science of epidemiology" (*id.* at 381).

Toxicology, on the other hand, is described as "the study of the adverse effects of chemicals on living organisms" (Reference

Manual on Scientific Evidence, Reference Guide on Toxicology, at 403 [citation omitted]).

> "There are three central tenets of toxicology, First, 'the dose makes the poison'; this implies that all chemical agents are intrinsically hazardous— whether they cause harm is only a question of dose. Even water, if consumed in large quantities, can be toxic. Second, each chemical agent tends to produce a specific pattern of biological effects that can be used to establish disease causation. Third, the toxic responses in laboratory animals are useful predictors of toxic responses in humans" (*id.*).

In these nine consolidated actions commenced in 1991, 1992, and 1993, in which plaintiffs seek damages for personal injury or wrongful death, the City moved pursuant to CPLR 3211 and 3212 to dismiss the actions as barred by the statute of limitations (CPLR 214-c [3]) and for failure to state a cause of action. The City's motion was based primarily upon an October 5, 1994 affidavit of an epidemiologist, Richard Neugebauer, submitted on behalf of the plaintiffs in *Annunziato v City of New York* (224 AD2d 31 [1996]), a case commenced in 1993 where, as here, residents or former residents of neighborhoods located near landfills on Staten Island sought to recover for personal injuries and wrongful death based on allegations that the diseases they suffered from were caused by exposure to toxic substances in the landfills. In opposition to the City's motion for summary judgment dismissing the personal injury causes of action as untimely pursuant to CPLR 214-c (3) and (4), the *Annunziato* plaintiffs, who were represented by the same attorney that represents plaintiffs in this case, submitted Dr. Neugebauer's affidavit. In his affidavit, Dr. Neugebauer stated that, although he and other members of an independent scientific committee were working on the hypothesis that toxic compounds released into the environment by the Staten Island landfills had caused and were causing an increased rate in cancer and other illnesses among residents living in proximity to those landfills, "it [was] not possible to arrive at any scientific conclusions yet."

As pertinent to this appeal, the Second Department found that, in order to take advantage of the discovery rule set forth in CPLR 214-c (4), plaintiffs had to present evidence that they learned that harmful substances at the landfills caused their illnesses within five years after their illnesses were diagnosed. The Court found that the *Annunziato* plaintiffs were unable to

satisfy this criterion since their own expert, Dr. Neugebauer, acknowledged that any link between the landfills and plaintiffs' illnesses was still in the hypothetical stage (224 AD2d at 39).

In opposition to the City's summary judgment motion in these actions, plaintiffs submitted an affidavit from the same Dr. Neugebauer, dated January 16, 2002, in which he now concluded that "[t]he Pelham Bay Landfill is to a reasonable degree of epidemiological certainty a cause of the increased rates of childhood acute lymphoid leukemia among the area residents . . . [and] was a substantial contributing factor to the acute lymphoid leukemia that occurred in the plaintiffs in this lawsuit." He stated that he reached this conclusion after evaluating two epidemiological studies conducted by the New York City Department of Health, "An Evaluation of Childhood Leukemia in the Pelham Bay Area of the Bronx, 1988" and "Cancer Incidence in the Pelham Bay Area of the Bronx, January, 1994." The 1988 study covered the years 1974-1985 and the 1994 study covered 1978-1987. Neither study found an elevation in cancer rates in the area surrounding the landfill.

Both studies were submitted to two independent scientific groups which criticized the 1994 report for failure to extend its analysis well into the 1990s; failure to examine cancer subtypes, specifically the importance of examining rates of acute lymphoid leukemia, not leukemia with all types combined; and, what Dr. Neugebauer refers to as "the questionable practice of adjusting for racial differences." As a result, Dr. Neugebauer states that one critical difference between the study conducted by his team and the Department of Health studies was that his group extended the study to include data up to 1996. Thus, he contended, consistent with the expectation of one of the critics of the Health Department report, "evidence of increased cancer rates emerges when the study is extended to include data well into the 1990s. This finding is also consistent with current knowledge regarding the long latency period that characterizes most cancers."

As to the earlier studies' alleged failure to examine cancer subtypes, Dr. Neugebauer's team limited its study to the specific type of cancer found in plaintiffs. "Only by doing this can we properly evaluate if risk for the cancer found in the plaintiffs is increased by exposure to the DUMP." Finally, Dr. Neugebauer, again referring to the "questionable practice of adjusting for racial differences," stated that the 1994 draft report's handling of data on race was criticized because, while the adjustment was

made for white non-Hispanic, black non-Hispanic, Hispanic and all others, there was no discussion of how the cases were assigned to these groups. As a result, "[i]n light of the critique by the NYS Cancer Registry of the uncertainties associated with race/ethnicity-adjustment and the substantial percent of cases missing data on race/ethnicity," Dr. Neugebauer stated: "we do not perform any such adjustments."

The City's epidemiological expert, Dr. Jonathan Borak, in his opposing affidavit, stated, without contradiction, that a large body of peer-reviewed literature documents that the incidence of acute lymphoid leukemia differs independently according to age, sex and race: i.e., it is highest in children under five; male children have been consistently found to have higher incidence rates compared to females; and the disease is consistently more common in white than black children. In addition to finding Dr. Neugebauer's affidavit incomplete since it presented insufficient information to allow a reader to understand his study and its methods, Dr. Borak stated, again without contradiction, that, as a result of Dr. Neugebauer's admitted failure to consider the confounding factor of race, his study did not meet generally accepted epidemiological methodology. Dr. Neugebauer's purported correction of his error in his reply affidavit, in which he claimed that adjustment for race made no difference in his statistical findings, again failed to meet generally accepted scientific standards since he persisted in providing insufficient information about his methods and incomplete information about his analysis. He also failed to actually analyze race and ethnicity code information about which he rendered opinions and his conclusions were not consistent with the multiple analyses performed by Dr. Borak using explicit, detailed, generally accepted methods, which analyses, unlike Dr. Neugebauer's purported study, were provided to the court.

Plaintiffs also submitted affidavits from Jesse H. Bidanset, a toxicology expert, which, other than listing 59 substances from A (acetamide) to Z (zinc) and describing "a collection of chemicals the likes to which has never been simulated in a laboratory," states: "While it is impossible to determine what effects each chemical has had due to its reaction with the other chemicals on the list it is to a toxicological certainty that the cumulative effect[ ] of combining all these chemicals is highly detrimental to human health." Dr. Bidanset concluded that the presence of known carcinogens emanating from the landfill in the form of soil contamination "ha[s] been a cause of a greater

than usual cancer, Leukemia and Hodgkin's disease rate among neighbors to the landfill site. Specifically, the plaintiff's [sic] in this lawsuit."

Diane Trainor, plaintiffs' occupational and environmental safety and health expert, based her opinion on her review of mountainous documents and noted that "defendants in this lawsuit originally commissioned many of the studies I looked at." The expert stated that nine known carcinogens (benzene, carbon tetrachloride, chloroform, ethylene dichloride, methylene chloride, perchloroethylene, trichloroethylene, vinyl chloride, and vinylidene chloride) have been found in the landfill and its emissions and that there is an abundance of research conclusively supporting the association between low-level exposure to toxic substances and the development of diseases, including leukemia and cancer. It is her opinion to a reasonable degree of environmental health certainty that the diseases found in the plaintiffs in this case were caused by their exposure to the landfill and its byproducts. Dr. Trainor also concludes that the City failed to control access to the working face of the landfill and that residents, including plaintiffs, were allowed to walk onto and around the landfill to fish and swim and were allowed to use the adjacent land for growing vegetables for their own consumption. However, she provides no factual basis for such conclusions.

The only evidence regarding plaintiffs' exposure to the landfill and its contents is contained in their individual affidavits, which, in nonspecific and conclusory fashion, state, in most instances, that while their mothers were pregnant and after they were born they lived for some indeterminate time in "close proximity" to the landfill; that their mothers "often" brought them to play in Pelham Bay Park which is located adjacent to the landfill; that they "often" smelled odors emanating from the landfill "both in my home and throughout the neighborhood"; and that they "often traveled to City Island for dinner and special occasions." Five plaintiffs reported that they swam or boated in Pelham Bay "on several occasions"; one plaintiff reported using horse manure from a stable that was very close to the landfill in his garden; and another stated that "we all ate locally grown fruits and vegetables."

Plaintiffs' medical expert Dr. Lanzkowsky concluded to a reasonable degree of medical certainty that plaintiffs were diagnosed with acute lymphoid leukemia and Hodgkin's disease, an opinion not in dispute. He added that it has been known for

almost a half century that benzene plays a causative role in leukemia. Again, as with Drs. Bidanset and Trainor, Dr. Lanzkowsky fails to even attempt to present any evidence of a dose-response relationship for any substance, carcinogenic or otherwise, in the landfill.

Plaintiffs argue that Drs. Trainor and Bidanset demonstrated that there were toxic levels of carcinogens in the landfill; that plaintiffs themselves provided evidence that they were exposed to these toxic levels; and that the plaintiffs developed the diseases which, according to the toxicological literature, are caused by these carcinogens. They argue that, if the requirement put forth by the City's expert, Dr. Borak (i.e., "the expert should offer an opinion as to whether the dose to which the plaintiff was exposed is sufficient to cause the disease") were accepted a plaintiff could never prove liability in an environmental toxic tort case. When the exposure, though chronic, comes by way of the air, the water and the soil, plaintiffs ask, how can the number of contacts ever be measured? The majority seemingly accepts this argument.

The majority contends that, to the extent the City challenges the methodology of Dr. Neugebauer's study, which found an increased evidence of acute lymphoid leukemia in the population closest to the landfill, and his failure to account for racial distribution, these factors are properly the subject of cross-examination at trial, as they go to credibility and to the weight to be given to the evidence (see Wesley, 83 NY2d at 426-427). However, as previously noted, the question of whether Dr. Neugebauer's methodology enjoys general acceptance in the scientific community is not for a jury to determine, but is a preliminary legal question for the court to decide.

As explained by Chief Judge Kaye in her concurring opinion in Wesley, the Court was unanimous

"in concluding that three inquiries are involved in the consideration of novel scientific evidence. The first—the Frye hearing—asks whether, theoretically, the accepted techniques, when performed as they should be, generate results generally accepted as reliable within the scientific community. . . . Next, a foundational inquiry must be satisfied before such evidence is placed before the jury: in each case the court must determine that the laboratory [here plaintiffs' experts] actually employed the accepted techniques. This foundational inquiry also goes to

admissibility of the evidence, not simply its weight (*People v Middleton*, 54 NY2d, at 45, 50, *supra*). Finally, infirmities in collection and analysis of the evidence not affecting its trustworthiness go to weight, to be assessed by the jury" (*Wesley*, 83 NY2d at 435-436).

In *Parker v Mobil Oil Corp.* (*supra*), a case directly in point, the plaintiff, a 17-year gas station attendant, sued three oil companies after he contracted acute myelogenous leukemia (AML) which his scientific experts opined was caused by his daily contact with and inhalation of gasoline and its vapors, both of which contained benzene, a known carcinogen. As in this case, the issue presented was to what extent the plaintiff was required to establish the precise level of his exposure to the carcinogen in order to establish that his disease was caused by it through a scientifically reliable methodology. The Second Department noted that a scientifically reliable methodology recommended by the World Health Organization and the National Academy of Sciences for drawing a sound cause and effect conclusion entails a three-step process:

"(1) a determination of the plaintiff's level of exposure to the toxin in question, (2) from a review of the scientific literature, proof that the toxin is capable of producing the illness, or general causation, and the level of exposure to the toxin which will produce that illness (i.e., the dose-response relationship) must be ascertained, and (3) establishment of specific causation by demonstrating the probability that the toxin caused the particular plaintiff's illness, which involves weighing the possibility of other causes of the illness. This three-step process has been acknowledged in numerous cases as generally accepted and reliable" (*Parker*, 16 AD3d at 651 [citations omitted]).

Applying that three-step process to the affidavits submitted by plaintiffs' experts in this case leads to the inescapable conclusion that their opinions are not based on generally accepted scientific principles. As is readily apparent, plaintiffs' experts fail to articulate with any specificity the level of any substance, let alone known carcinogens, to which plaintiffs were exposed. Nor do they point to any scientific literature that has concluded that any substance found in the landfill is capable of producing acute lymphoid leukemia or Hodgkin's disease or the level of exposure

to the substance that will produce that illness. Indeed, it speaks volumes that the official Web site of The Leukemia & Lymphoma Society (www.leukemia-lymphoma.org) reports that the cause of acute lymphoid leukemia, also known as acute lymphocytic leukemia, is not evident and, although scientists continue to explore possible relationships with lifestyles or environmental factors, unfortunately no firm conclusions have yet been reached. Thus, any conclusions reached by plaintiffs' experts as to the plaintiffs' level of exposure to known carcinogens found in the Pelham Bay landfill and whether such exposure was substantial enough to cause acute lymphoid leukemia are purely speculative (*see Parker*, 16 AD3d at 653).

Moreover, inasmuch as Dr. Neugebauer specifically stated that until data from years after 1996 is made available "it is not possible to draw firm conclusions as to whether residential proximity to the DUMP is associated with increased rates of Hodgkin's disease among children," the complaints of the two plaintiffs suffering from Hodgkin's disease, Jennifer Nessen and Brian Walsh, should have been dismissed.

The majority attempts to excuse plaintiffs' failure of proof on the ground that experts in the fields of both epidemiology and toxicology agree that although studies providing dose-response relationships are strong evidence of causation, they are not essential to establishing causation (Reference Manual on Scientific Evidence, Reference Guide on Epidemiology, at 377 [2d ed]). It neglects, however, to acknowledge that such conclusion applies only where "some causal agents do not exhibit a dose-response relationship when, for example, there is a threshold phenomenon (i.e., an exposure may not cause disease until the exposure exceeds a certain dose)" (*id.*).

Not only is there no claim that plaintiffs' acute lymphoid leukemia was the result of minimal or low doses of known carcinogens, but any such opinion would certainly be novel given the sharp debate on the subject in the relevant scientific community ("The question whether there is a no-effect threshold dose is a controversial one in a variety of toxic substances areas" and "dose-response relationship for low doses is 'one of the most sharply contested questions currently being debated in the medical community' " [*id.* at 377 n 119 (citations omitted)]). Indeed all of the opinions of plaintiffs' experts, particularly that of Dr. Neugebauer, are, at the very least, novel inasmuch as eight years earlier, in 1994, it was undisputed that any cause and effect relationship between toxic substances in the Staten

Island landfills at issue in *Annunziato* and similar diseases suffered by their neighbors was still hypothetical. Plaintiffs do not allege that there is a substantive difference between the landfills and their effects in *Annunziato* and the Pelham Bay landfill in these cases. Nor is there any support for plaintiffs' claim that they discovered the alleged cause of their illnesses prior to the submission of Dr. Neugebauer's 2002 affidavit in response to the City's motion for summary judgment.

In his reply affidavit on behalf of plaintiffs, Dr. Bidanset states that the City's expert Dr. Borak's assertion that a dose response must be indicated for a successful toxicological evaluation is just incorrect. He states that there is no threshold value and dose is not a requirement of the oncogene theory of carcinogenesis (a gene having the potential to cause a normal cell to become cancerous), because transformation of a single cell does not have to obey a dose-response relationship. However, Dr. Bidanset's similar opinion regarding causation, including his oncogene theory, has been flatly rejected as merely a hypothesis not grounded in reliable scientific methods (*see Wills v Amerada Hess Corp.*, 2002 WL 140542, 2002 US Dist LEXIS 1546 [SD NY 2002], *affd* 379 F3d 32 [2004], *cert denied* — US —, 126 S Ct 355 [2005]). The majority states that *Wills* is distinguishable on the law and the facts, the only similarity being that Dr. Bidanset appeared as an expert toxicologist and the plaintiffs in each case developed cancer; however, what is not distinguishable is that Dr. Bidanset's opinions were found insufficiently reliable to be admissible as evidence; that the court found that his reports demonstrated that Dr. Bidanset was ready to form a conclusion first, without any basis, and then try to justify it; and, that his reasons for departing from the mainstream understanding of causation to embrace the oncogene theory were wholly unsatisfactory. As here, Dr. Bidanset in *Wills* could cite to no epidemiological studies pointing to an increased risk of the cancer there alleged as a result of exposure to the toxins there in question (2002 WL 140542, at *5, 2002 US Dist LEXIS 1546, at *14-16).

"In support of its statement that "two chemicals identified by Dr. Bidanset in the landfill, trichloroethylene (TCE) and tetrachloroethylene, are industrial solvents which have been linked to acute lymphoid leukemia (ALL), the exact form of leukemia developed in the majority of the plaintiffs in this lawsuit," the majority cites *Anderson v W.R. Grace & Co.* (628 F Supp 1219 [D Mass 1986]), a case it describes as concerning "ALL

'cancer clusters' " allegedly caused by those chemicals in a water supply in Woburn, Massachusetts. However, that case, which was the basis for the motion picture *A Civil Action*, nowhere mentions acute lymphoid leukemia. In fact, there is only one reported case in the United States that mentions that disease (1 Misc 3d 897 [2003]), the decision presently on appeal.

As in *Parker*, plaintiffs present no evidence of the concentration level of benzene or any other substance to which they were exposed. Their experts fail to quantify their exposure in any typically utilized unit of measurement such as parts per million factored against the duration of time to which the plaintiffs were exposed.

> "Without any quantification of the plaintiff's level of exposure to benzene [or any other substance alleged to have caused plaintiffs' illnesses], required by the first part of the above described three-step process, the second part of that process, i.e., ascertaining the threshold level of benzene exposure which has been proven to cause AML (the parties do not dispute that a certain level of benzene exposure has been proven to cause AML) loses any significance" (*Parker*, 16 AD3d at 652).

Again, the majority attempts to distinguish *Parker* on the ground that the "dose-response" relationship is only one of nine factors which can cause an epidemiologist to draw a causal inference. However, not only did Dr. Neugebauer fail to consider the dose-response relationship, he also neglected to address the eight other factors alluded to by the majority: temporal relationship; strength of the association between the exposure and disease; replication of the findings; biological plausibility (consistency with existing knowledge); consideration of alternative explanations; the effect of cessation of exposure; specificity of the association (the exposure is associated only with a single disease or type of disease); and, consistency of the findings with other relevant knowledge (Reference Manual on Scientific Evidence, *supra* at 375-379).

The majority also attempts to distinguish *Parker* on the ground that *Parker* involved one plaintiff whereas "[t]his litigation arose from a community with a disproportionate incidence of fatal cancers." However, even if most of the plaintiffs suffer from the same illness, each plaintiff's claim depends on its own individual facts, as recognized by plaintiffs' concession that there was a failure to establish a causal connection between the

landfill and the cancer deaths of Joanne Marie DaBenigno and her sister Patricia Ann DaBenigno.

In any event, assuming plaintiffs were to argue that there is no threshold level of exposure to the toxins in the landfill below which acute lymphoid leukemia or Hodgkin's disease cannot result, the scientific reliability of this so-called "linear non-threshold model" ("if a lot of something is bad for you, a little of the same thing, while perhaps not equally bad, must be so in some degree") has been flatly rejected as a mere hypothesis (*Parker*, 16 AD3d at 652). The *Parker* court further found misguided studies which merely state that no level of benzene exposure can be considered " 'safe.' Of course, stating that any exposure to benzene is 'unsafe' is not tantamount to stating that any exposure to benzene causes AML" (at 653). It also noted that one of the plaintiff's experts, as here, made nonspecific conclusions regarding the plaintiff's level of exposure using indefinite terminology such as "extensive" and "abundant opportunity for exposure" while the other stated, without any quantitative support, that plaintiff's exposure to benzene was "greater than that of the subjects of an oil refinery study." (*Id.* at 652, 653.) "Thus," the Court stated, "any conclusions as to the plaintiff's level of exposure to benzene and whether the exposure was substantial enough to cause AML, were purely speculative" (*id.* at 653 [citations omitted]). Accordingly, the Court held that plaintiff's expert testimony should have been precluded on the ground that it was not scientifically reliable and therefore inadmissible.

The majority finds that it is "not surprising" that plaintiffs' toxicologists "did not present a specific dose-response threshold of any particular carcinogen to support their opinions that plaintiffs' cancer was caused by exposure to the landfill." Instead, it apparently finds sufficient plaintiffs' proffer of "a combination of epidemiological and toxicological reports to support the theory that their extended exposure to hazardous levels of numerous carcinogens in this particular landfill caused their cancers." Not only is this fuzzy science at its worst, but it overlooks the fact that all of plaintiffs' experts fail to satisfy the first prong of the "generally accepted and reliable" three-step analysis approved in *Parker*, viz., a determination of the plaintiffs' level of exposure to the toxins in question.

The majority also states that "[t]he record contains epidemiological reports from both plaintiffs and the City, with differing conclusions about whether the incidence of cancer was high in

the area closest to the landfill." However, the record only contains the 40-page report issued by the City in 1988 and the 120-page 1994 study conducted by the City, both of which concluded that there was no association between the landfill and plaintiffs' diseases. Those studies set forth in detail the background and objectives, methods, and results of such studies and are replete with specific references to the tables and figures relied upon by the authors. On the other hand, other than attaching a list of references to his reply affidavit, which includes a reference to a "Neugebauer REPORT 2001" purportedly entitled "Epidemiological Study of Increased Incidence of Childhood Cancers Associated with Residential Proximity to the Pelham Bay Landfill in the Bronx: Acute Lymphoid Leukemia and Hodgkin's Lymphoma August 21, 2001," Dr. Neugebauer neglects to provide a copy of such report and in fact makes not a single reference to such report in the body of his affidavit.

Even if Dr. Neugebauer had used generally accepted methods and documented the data and authorities relied upon in reaching his conclusion, his opinion would still be insufficient to establish that each individual plaintiff's illness was caused by that individual's exposure to toxic substances in the landfill. The study conducted by Dr. Neugebauer is what is called an ecological or demographic study, viz., a study of the occurrence of disease based on data from populations, rather than from individuals (Reference Manual on Scientific Evidence, Reference Guide on Epidemiology, at 391). Such studies are useful in identifying areas for further research, and researchers who identify a difference in disease or death in a demographic study may follow up with a study based on data gathered about individuals (*id.* at 345). "[A]n agent cannot be considered to cause the illness of a specific person unless it is recognized as a cause of that disease in general" (Philip Cole, *Causality in Epidemiology, Health Policy and Law*, 27 Envtl L Rep [Envtl L Inst] 10279, 10284 n 53 [June 1997], quoted in Reference Manual on Scientific Evidence, *supra* at 383-384).

Plaintiffs also rely upon various federal and sister state decisions, as well as this Court's decision in *Munoz v Puretz* (301 AD2d 382, 383-384 [2003]), for the proposition that, even where evidence of "dose" was not available, courts permitted extrapolation of harmful levels from the fact of the symptoms themselves and submit that the result should be no different here. Such reliance is misguided. In *Munoz,* for example, plaintiff's expert concluded that one of the infant plaintiffs "had been

subjected to lead toxicity in utero based on his examination of the child and the confirmed finding of lead-based paint on the premises and the child's subsequent diagnosis of elevated lead levels" based upon lab tests. (*Id.* at 383.) We rejected the argument that the expert's conclusion lacked scientific reliability since neither the fact of injury from exposure to lead-based paint nor in utero transmission implicates novel theories of liability (*id.*). Likewise, in the other cases relied upon by plaintiffs, courts permitted experts to extrapolate from animal studies and, in one case, permitted an expert to opine that certain refinery workers were exposed to levels of benzene that were several hundred times above the permissible exposure level of one part per million since the symptoms the workers began suffering shortly after the complained-of toxic substance was introduced into the refinery—headache, nausea, disorientation, and fatigue—are well-known symptoms of overexposure to benzene. The expert concluded that these symptoms were all indications of exposure to benzene at levels of at least 200-300 parts per million.

Here, on the other hand, plaintiffs fail to provide any data that would permit their experts to extrapolate so as to conclude with any scientific basis that any substance or substances in the Pelham Bay landfill caused plaintiffs' acute lymphoid leukemia or Hodgkin's disease. Thus, given the absence of any data, any reference to scientific authority or treatises, or other corroborating evidence, such conclusion is speculative, lacks any evidentiary foundation, has no probative value, and is insufficient to withstand summary judgment (*Buchholz v Trump 767 Fifth Ave., LLC*, 5 NY3d at 9).

The case for rejecting plaintiffs' experts' opinions as inadmissible is even stronger here than in *Parker* since there the plaintiff's experts relied upon studies that ultimately reached the conclusion that increased levels of exposure to benzene have been shown to cause leukemia, a fact not disputed by the parties. Here, on the other hand, plaintiffs can point to no study that concludes that acute lymphoid leukemia or Hodgkin's disease is caused by any substance found in the landfill. While that may be a generally accepted hypothesis, it is not the type of proof necessary to withstand summary judgment. As in *Parker* and *Annunziato,* plaintiffs' experts have failed to posit a causal connection, based upon a scientifically reliable methodology, between plaintiffs' specific level of exposure to any substance in the Pelham Bay landfill and their acute lymphoid leukemia.

Finally, the majority rejects the City's argument that these actions should be dismissed as untimely because plaintiffs have presented proof that they learned within five years after their illnesses were diagnosed that harmful substances at the landfill were responsible for their illnesses. However, since the opinions of plaintiffs' experts to that effect are inadmissible and have no probative value, there is no such proof and, if they were not being dismissed for failure to state a cause of action, the complaints of all but the infant plaintiffs, Amanda Caryn Arisio, Antonio Carollo, Rufino Irizarry, Michelle Herta Phillips and Kevin Simpson, would have to be dismissed as untimely.

SAXE and CATTERSON, JJ., concur with MAZZARELLI, J.P.; ANDRIAS and WILLIAMS, JJ., dissent in a separate opinion by ANDRIAS, J.

Order, Supreme Court, Bronx County, entered October 16, 2003, modified, on the law, to dismiss, with leave to replead, plaintiff Angelilli's complaint, and otherwise affirmed, without costs.