**NEW YORK COASTAL FISHERMEN'S
ASSOCIATION, Plaintiff,**

v.

**NEW YORK CITY DEPARTMENT OF
SANITATION, New York City Depart-
ment of Environmental Protection, and
the City of New York, Defendants.**

No. 90 Civ. 4721 (GLG).

United States District Court,
S.D. New York.

Aug. 21, 1991.

Smith & Barbanes, Yonkers, N.Y. (Mary Barbanes and Elizabeth Barbanes, of counsel), for plaintiff.

Victor C. Kovner, Corp. Counsel of City of New York, New York City (Antonia Levine and Susan Kath, of counsel), for defendants.

## OPINION

GOETTEL, District Judge:

This action concerns the limitations on a party's ability to institute a citizen suit to challenge violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (the "CWA"), when state authorities have already entered into two Orders on Consent with the parties responsible for the pollution.

### I. FACTS

The sordid details of this bureaucratic and political nightmare are as follows.

The Pelham Bay Landfill (the "landfill" or the "dump"), located in Bronx County, New York City, was operated from 1963 to 1979 by the New York City Department of Sanitation ("DOS"). Thereafter, the landfill was closed, but not effectively capped, since in 1982 complaints about leachate streams and ponds were lodged by individuals living in the vicinity of the landfill.[1] In response to these complaints, the New York State Department of Environmental Conservation ("DEC"), which is charged with enforcing the state's environmental laws, began investigating the matter and in December 1985, DEC and DOS entered into an Order on Consent (the "1985 Order") requiring DOS to submit two leachate management plans to the state, one temporary and one permanent. Finally, in July 1988, after the usual bureaucratic delay, DOS submitted its interim proposal. The proposal provided for the collection of the leachate and its subsequent recirculation into the landfill. DEC rejected this, however, claiming it was insufficient to address

---

1. Leachate refers to that substance which is created when, over a period of time, compression of the solid waste, and other refuse contained within the landfill, forces liquid from the refuse. Leachate can also be produced when storm water seeps into the landfill and mixes with the refuse. The resultant liquid, or leachate, takes on the properties of certain constituents of the refuse. Leachate typically is very concentrated, high in metal and organic constituents.
   *Hudson River Fishermen's Ass'n v. County of Westchester,* 686 F.Supp. 1044, 1046 n. 2 (S.D.N.Y.1988).

the problem.[2] An alternate temporary proposal was quickly adopted and approved by the DEC. The proposal provided that the leachate was to be collected, passed through a sewage system, and ultimately discharged into the Eastchester Bay (the "Bay"), which is located in Bronx County and feeds into the Long Island Sound. Even with this modification to the plan, construction began just one month after DOS filed its initial proposal, and beginning in September 1988, DOS began discharging the leachate into the Bay. Thereafter, in April 1990, a second Order on Consent (the "1990 Order") was entered into between DOS and DEC, requiring the completion by 1995 of a further remedial plan for the landfill.[3]

Plaintiff, the New York Coastal Fishermen's Association, filed its citizen suit in this court on July 17, 1990.[4] Plaintiff is organized for the preservation of the Long Island Sound. Plaintiff contends that the defendants' actions as of September 1988 in dumping the leachate into the Bay have violated the CWA and plaintiff now seeks civil penalties, as well as declaratory and injunctive relief. Plaintiff contends that while a permit for discharging pollutants should have been sought from either the EPA or the DEC, see 33 U.S.C. § 1342(a), (b), no such application was ever made.

The parties now move for summary judgment.[5] They agree that there are no genuine issues of material fact to be tried and that the action is ripe for summary judgment. In fact, defendants do not dispute that they are violating the CWA by discharging leachate into the Bay. Instead, their only defense is that a citizen suit for

penalties under the CWA is impermissible if the state "has commenced and is diligently prosecuting an action under a State law comparable to this subsection." Id. § 1319(g)(6)(A)(ii).[6] In this respect, defendants contend that the actions of the DEC in obtaining the 1985 and 1990 Orders is unequivocal evidence of the state's diligent prosecution efforts.

In response, plaintiff focuses on the requirement that the state action be "comparable" to a federal enforcement proceeding under the CWA. Plaintiff argues that the DEC's actions are not comparable because the state has never sought to penalize the defendants. Moreover, plaintiff suggests that the delays that already have occurred, and the fact that it will be quite some time before a new facility will be in place, raise serious questions as to the DEC's diligent prosecution. Finally, plaintiff contends that even if civil penalties cannot be sought in this citizen suit, its claims for declaratory and injunctive relief remain viable. Defendants do not contest the accuracy of this last argument, but rather, argue that it is impractical for this court to attempt to fashion a remedy when the state has already done so.

## II. DISCUSSION

The Clean Water Act was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "The Act makes unlawful the discharge of any pollutant into navigable waters except as authorized by specific sections of the Act." *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49, 52, 108 S.Ct. 376, 379, 98 L.Ed.2d

**2.** In fact, in our decision of May 1988 in *Hudson River Fishermen's Ass'n*, 686 F.Supp. at 1047 n. 4, we ourselves questioned the long-term benefits of such a recirculation system.

**3.** In July 1990, DOS's control over the landfill was transferred to the New York City Department of Environmental Protection ("DEP").

**4.** In compliance with statutory mandates, on April 3, 1990 plaintiff served its Notice of Intent to Sue upon officials at the DOS, the DEC, and the EPA, among others.

**5.** Procedurally, plaintiff moved for judgment on the pleadings and when defendants moved for

summary judgment, plaintiff cross-moved for the same relief. Due to the pendency of the summary judgment motions, we need not consider plaintiff's motion for judgment on the pleadings.

**6.** In their answer, defendants also claim that they should not be held responsible for discharging the leachate since it was done with the DEC's acquiescence. This issue, however, is not separately pursued in the motion papers and is only part of the "diligent prosecution" argument.

306 (1987). One type of authorization is the obtaining of a permit from either the EPA or an analogous state agency, *see* 33 U.S.C. § 1342(a), (b), but one was not sought in this case.[7] While the CWA grants the EPA enforcement power, it also permits "citizen suits" in the absence of either federal prosecution of the CWA or state prosecution of comparable state statutes. A prevailing plaintiff in a citizen suit can obtain injunctive relief and/or civil penalties payable to the United States government. *Id.* § 1365(a); *Gwaltney,* 484 U.S. at 53, 108 S.Ct. at 379.

The statute imposes certain limitations on when a citizen suit for penalties may be maintained. Specifically at issue in the case at bar is the provision that "any violation— ... with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection ... shall not be the subject of a *civil penalty action* under ... section 1365 of this title." 33 U.S.C. § 1319(g)(6)(A)(ii) (emphasis added). Section 1365 is the statutory provision authorizing citizen suits for both penalties and injunctive relief. In addition, if an action brought by the government is pending in either federal or state court, a citizen suit for any purpose, injunctive or otherwise, cannot be brought. *Id.* § 1365(b)(1)(B); *see Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57, 63 (2d Cir.1985). In the case at bar, defendants contend that DEC's enforcement of New York law, which resulted in the entry of the two consent orders, is evidence of its diligent prosecution of comparable actions.

■ Plaintiff initially argues that the state is not pursuing a comparable action. Plaintiff points to the fact that the subtitle of the section under which section 1319's limitation on citizen suits is contained is entitled "administrative penalties." Therefore, plaintiff suggests, it is only when the state's prosecution seeks to penalize the respondent that a citizen suit is precluded. We reject this argument as it is an overly technical interpretation of the statute.

.The main purpose behind the limitation of citizen suits is to permit the federal and state governments to exercise their powers to remedy violations of the Clean Water Act. "[T]he citizen suit is meant to supplement rather than to supplant governmental action." *Gwaltney,* 484 U.S. at 60, 108 S.Ct. at 383. In this regard, a citizen suit may not "seek to recover fines and penalties that the government has elected to forego." *Atlantic States Legal Found. v. Eastman Kodak Co.,* 933 F.2d 124, 127 (2d Cir.1991) (citing *Gwaltney,* 484 U.S. at 60–61, 108 S.Ct. at 382–83). Thus, it cannot be reasonably argued that only when a penalty is actually imposed that a citizen suit is precluded. Such an interpretation would unnecessarily undermine state and local enforcement efforts. *Cf. id.* ("we do not believe the Clean Water Act can or should be read ... to prevent state or local authorities from achieving a settlement as to conduct that is the subject of a citizen complaint"). Under New York's Environmental Conservation Law ("ECL") section 71–1929, the state, through the DEC, can seek penalties for violations of article 17 of the ECL, which is entitled Water Pollution Control. The fact that in the case at bar no penalties were imposed, although the right was reserved in both the 1985 and 1990 Orders,[8] does not, in and of itself, require a finding that the state is not enforcing a comparable statute. *See North & South Rivers Watershed Ass'n v. Town of Scituate,* 755 F.Supp. 484, 486 (D.Mass.1991) (look to entire state statutory scheme and state's decision not to employ penalty pro-

---

7. Defendants suggest that since they were acting at the direction of the DEC in discharging the leachate into the Bay, there was no need to apply for a permit.

8. For example, the 1985 Order states that:
   The Department will not prosecute or bring any enforcement action against the Respondent in any administrative or judicial forum on account of the violations which led to the entry of this Order. The Department reserves its right to prosecute or bring an enforcement action against the Respondent in any appropriate administrative or judicial forum for violations of this Order.
   1985 Order ¶ IV(D). Similarly, the 1990 Order reserves the DEC's "right to enforce this Order against Respondent ... in the event that Respondent shall fail to satisfy any of the terms hereof." 1991 Order ¶ XXV(b).

visions "does not change the fact that the statutory scheme under which the [State] acts is comparable").

■ Plaintiff's second argument, however, requires greater scrutiny. Plaintiff again focuses on the requirement that the state be enforcing a comparable statute and argues that pollution control of navigable waters was not at issue in either the 1985 or the 1990 Order. Plaintiff cites this court's decision in *Hudson River Fishermen's Ass'n v. County of Westchester*, 686 F.Supp. 1044 (S.D.N.Y.1988), in which we found a citizen suit was not precluded because the government's Consent Order expressly did not apply to the damage complained of by the plaintiff. *Id.* at 1052. Thus, it could not be said "with any confidence that the conclusion of the Government's litigation w[ould] address or encompass the specific claims of the plaintiff." *Id.*

The parties agree that the 1985 Order came about because of complaints from residents of Shore Road in the Bronx, which we are told is commonly used for jogging and horseback riding, about leachate streams and ponds flowing from the landfill. The CWA prohibits, *inter alia*, "the discharge of any pollutant by any person." 33 U.S.C. § 1311(a). The "discharge of a pollutant," in turn, means "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12)(A). Navigable waters are "the waters of the United States, including the territorial seas," *id.* § 1362(7), and at least one court has specifically stated that groundwater contamination from the discharge of pollutants into the ground is not covered even though the groundwater, and hence the contaminant, ultimately flows into a navigable water. *Kelley v. United States*, 618 F.Supp. 1103, 1107 (W.D.Mich. 1985). Thus, plaintiff seems to suggest that since in 1985 the state had no information before it with respect to pollution of navigable waters as they are defined in the CWA, the state's action cannot be deemed comparable.

Although this argument sounds plausible, we note that the 1985 Order refers to leachate entering the "surface and groundwaters" in violation of state and federal statutes. 1985 Order ¶ 5(b). Thus, the Order is not limited to groundwaters, which are not covered by the CWA, but rather, includes surface waters, which arguably are covered. *See Inland Steel Co. v. Environmental Protection Agency*, 901 F.2d 1419, 1422 (7th Cir.1990) ("navigable waters [under CWA] might include ground waters connected to surface waters"). In addition, the Order states that the DEC is acting pursuant to, *inter alia*, article 17, title 8 of the ECL, which refers generally to water pollution control and, more specifically, to the state's pollutant discharge elimination system. Thus, based solely on the 1985 Order, a viable argument can be made to suggest that the state was enforcing a statute comparable to the CWA. Of course, the principal obstacle faced by defendants on this issue is that since the flow of leachate into the Eastchester Bay did not begin until 1988, the 1985 Order cannot have addressed this specific claim.

The 1990 Order is even less conclusive on this issue. First, there is no mention of the CWA in the entire Order. In fact, the only federal statute mentioned in the 1990 Order is the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), and the Order states that "this order shall constitute an administrative settlement under CERCLA." 1990 Order ¶ XXVII. The only mention of water is that the remedial design plan must provide for the treatment or disposal of contaminated groundwater. 1990 Order ¶ XI(a)(2). Defendants, however, suggest that the 1990 Order specifically incorporates the 1985 Order, which we previously noted refers to both surface and groundwaters.

Regardless of how one views the foregoing discussion, there is one crucial factor that must be considered. In this case, if the government's efforts to cap the landfill are successful, the problem with discharges into Eastchester Bay, which led to this suit, will be resolved. In other words, once the dump is successfully capped, no further leachate will be routed into the Bay. Thus,

the government's efforts may reach the same result sought by plaintiff. This, however, does not answer the most difficult question presented, which is whether the state's efforts in attempting to stem the discharge of leachate into the Bay have been diligent. Resolution of this question requires a further discussion of the facts previously discussed.

After operating for approximately fifteen years, the landfill was closed on December 31, 1978. However, leachate was being generated and in 1982, defendants attempted to cap the facility. The capping was unsuccessful and leachate streams and ponds were readily apparent in the general vicinity of the landfill, particularly on Shore Road. At the same time, the DEC apparently first became aware of the problems and in 1983 it declared the landfill a inactive hazardous waste site.[9]

Between 1982 and 1985, it does not appear as if anything concrete was done to rectify the situation. However, in December 1985, DEC and DOS entered into the 1985 Order based on the ineffective closure of the landfill, the fact that leachate was entering the surface and groundwater in violation of state and federal statutes, and the non-compliance with regulations governing tidal wetlands. The 1985 Order stated that corrective measures were to be taken and while a proposal was to be submitted to DEC by December 31, 1986, the project did not have to be completed until December 31, 1989.

Besides requiring a long-term plan, the 1985 Order required defendants to develop a short-term plan within 90 days of the date of the Order, to be implemented thirty days thereafter, for the "temporary control and/or elimination of off property leachate streams and ponds." 1985 Order ¶ III(A). Thereafter, however, in March 1986, DOS was given an extension of time to submit its temporary plan. Rather than submit its plan, DOS began attempting to obtain reimbursement from the state under the Environmental Quality Bond Act of 1986. While defendants offer many irrelevant ex-

cuses for the delay, it was finally in July 1988 that the temporary plan for the control of leachate was submitted.

The temporary plan proposed that the leachate be recirculated through the landfill after first being collected in an interceptor trench. DEC rejected the plan. However, in what was an amazing burst of speed from these administrative agencies, a revised plan was approved and construction began in September 1988. This plan provided that the interceptor trench would still be used, but rather than recirculate the leachate into the landfill, it would be funneled through a catch basin, then channeled into a pre-existing storm drainage system, and, finally, discharged into the Eastchester Bay. DEC approved this. Amazingly enough, it took three years to devise a temporary plan to control the flow of leachate and this resulted in a process that permits the leachate to be dumped into Eastchester Bay. While this court does not profess to have any particular expertise in the control of hazardous waste, it is quite apparent that individuals using the Bay would be just as upset about the contaminants as were the residents of Shore Road.

Thereafter, with leachate having been dumped into the Eastchester Bay for over two years, plaintiff served on the defendants a Notice of Intent to Sue for Violations of the Clean Water Act. Two weeks later, on April 17, 1990, defendants entered into the 1990 Order with the DEC. As previously stated, defendants contend that the 1990 Order is a continuation of the 1985 Order, although the 1990 Order "supercede[s] any conflicting requirements concerning Closure Plans or other long range remediation efforts required by [the 1985 Order]." 1990 Order ¶ 6. The Order establishes numerous target dates for the defendants. For example, the defendants must first produce various documents to the state. 1990 Order ¶ II. Thereafter, the defendants are required to conduct a Remedial Investigation/Feasibility Study, which is to be completed in early 1993. A

---

**9.** It has been learned that illegal dumping of hazardous wastes by parties other than the defendants occurred at the dump between 1975 and 1979.

design is then to be submitted to the DEC, with construction to begin in July 1993. The project, whatever it ultimately may be, is scheduled to be completed in July 1995. Of course, these dates are only targets. Indeed, at oral argument defense counsel assured us that the project would not be completed before 1995.

Since a solution to this problem is at a minimum four years away, defendants suggest that they want to adopt a further interim measure. Thus, they contend that in September 1990, they contacted Stone & Webster, an engineering consultant to DEP, to develop an interim measure to control the leachate. In March 1991, the firm apparently issued its report, proposing four alternatives to temporarily control the leachate. Simply, the proposal suggests that the leachate be intercepted before it leaves the dump and then treated before being discharged into the Bay. Although defendants recognize that DEC approval is necessary for this further interim measure, we are told that the engineers' proposal has not yet even been submitted to the state. Thus, implementation of this temporary measure is still a long way off.

With these facts before us, we now turn to the arguments the parties raise on the question of diligent prosecution. To refute defendants' claim of diligent prosecution, plaintiff suggests that neither the 1985 nor the 1990 Order addresses the Clean Water Act as it concerns Eastchester Bay. However, as we mentioned previously, an important factor in this regard is that if either Order is complied with by the defendants, there will not be a problem in Eastchester Bay. "[T]he state enforcement proceeding [may cause] the violations alleged in the citizen suit to cease without any likelihood of recurrence." *Atlantic States Legal Found.*, 933 F.2d at 127. The question is when.

We next turn to defendants' claims, which are diametrically opposed to those of the plaintiff. Defendants contend that both Orders are addressed to the Clean Water Act (or analogous state provisions) and, therefore, that there has been diligent prosecution from at least 1985, if not 1983

when the state first became involved. Moreover, this prosecution will run until 1995 when the latest project supposedly will be completed. There are many problems with this argument. First, it is unclear how the violations complained of by the plaintiff, *i.e.*, dumping in the Eastchester Bay beginning in 1988, could have possibly been addressed by a 1985 Consent Order. More importantly, however, the argument raised by the defendants flies in the face of their claim of diligent prosecution. Since defendants allege state involvement since 1983, this means that at least twelve years will run before the problem is rectified. This is not diligent prosecution.

The following is a perfect example of the state's lack of diligence. The 1985 Order required that the defendants establish both a temporary and a permanent plan to eliminate the flow of leachate. While it took until 1988 for even a temporary plan to be adopted, the defendants claim that throughout this three-year delay, DEC was diligently seeking DOS's compliance with the 1985 Order. It is inconsistent to say the least for DOS to argue that we should credit DEC's diligence while DOS itself obviously did not feel compelled to comply with DEC's alleged demands. The state was acting as a pen pal, not a prosecutor. In addition, while the 1988 measure was to be temporary, the permanent measure that was to have been adopted pursuant to the 1985 Order has never been established. Instead, the state entered the 1990 Order, which affords defendants more time to figure out what should be done. *See Dague v. City of Burlington*, 935 F.2d 1343, 1352 (2d Cir.1991) (no diligent prosecution under analogous provision of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972, where state did not demand compliance with an Assurance of Discontinuance and granted respondent many extensions of time).

Even if it the state is not entitled to a 1983 or 1985 starting date for its "prosecution," and instead 1988, the date the discharge began, or 1990, the date of the second Order, is used, the state's action remains insufficient. As noted, the 1988 measure, which was meant to be temporary

until a permanent measure was adopted, has not yet been superceded by the permanent plan called for in the 1985 Order. Moreover, the 1990 Order still permits the defendants five years to adopt a plan and construct a new facility. This is simply too long to rectify a problem that has been known about since 1983. We also lack confidence that the target date of 1995 will be enforced and this will lead to further damage to Eastchester Bay. It is simply incomprehensible that the discharge of leachate into Eastchester Bay, which was to be a temporary measure adopted to remedy the problem, should continue for seven years. As defendants themselves recognize, "citizen suits [can proceed in] those instances where the federal and state entities are not fulfilling their enforcement duties." Defendants' Reply Memorandum of Law at 4. This is precisely such an instance when the government has not been fulfilling its duties.

Therefore, since this claim of diligent prosecution is the only defense raised by defendants, plaintiff is entitled to summary judgment.

■ Having found for the plaintiff, we must next ascertain the remedy to which plaintiff is entitled. As to a civil penalty, plaintiff's complaint demands $25,000 per day of violation. On this issue alone, an evidentiary hearing will be necessary. As stated in 33 U.S.C. § 1319(d):

> In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d). In this regard, we would certainly consider, *inter alia*, that the illegal dumping of hazardous waste was performed by parties other than the defendants, that the state has been involved since 1983, and that the state, according to defendants, actually approved the dumping of the leachate into Eastchester Bay.[10] Nonetheless, these are questions for another day.

■ In addition, plaintiffs have sought injunctive and declaratory relief. As to the declaratory relief, the defendants themselves do not dispute that they are violating the Clean Water Act. As to injunctive relief, plaintiff's complaint seeks an order immediately enjoining defendants from discharging leachate into Eastchester Bay. Before addressing this, we note that the limitation on citizen suits previously discussed relates only to actions for civil penalties, not injunctive or declaratory relief. Thus, even if we had concluded that the state was diligently prosecuting an action against the defendants, injunctive relief would still be appropriate. While defendants agree with this proposition, they nonetheless contend that since the state is intimately involved with cleanup efforts, there is no need for a federal court's intervention.

We disagree. Notwithstanding the difficulties federal judges often have in forcing actions by other governmental branches, be they state or federal, we cannot simply throw our hands up. However, we recognize that plaintiff's demand for immediate relief is unworkable. The leachate exists and something must be done to temporarily control it. At this stage, we propose that plaintiff draft a permanent injunction permitting defendants a reasonable time to develop an alternative plan. If necessary, a Special Referee will then be appointed to oversee compliance with this injunction. Plaintiff's proposed injunction with time periods for action by the defendants is to be submitted within twenty days. Defendants will then have ten days to respond.

## III. CONCLUSION

The cleanup of a hazardous waste dump cannot occur overnight. However, the de-

---

**10.** As to this last issue, plaintiff contends that the state was not aware until plaintiff made complaints in December 1989 that leachate was being dumped into the Eastchester Bay. Defen-

dants vigorously contest this claim and, in fact, contend that DEC was deeply involved in the decision to adopt such a temporary measure.

**170**

fendants' suggestion that the state has been diligently prosecuting the cleanup of the Pelham Bay Landfill since 1983 cannot be taken seriously in light of the fact that relief is not in sight until at least 1995. Moreover, the fact that the remedial measure adopted by the defendants to eliminate leachate from one section of the Bronx included the discharge of the very same contaminants into the Eastchester Bay does not inspire confidence. The state has had its chance. Now it is time for "diligent prosecution."

SO ORDERED.