[932 NYS2d 428]

PATRICIA NONNON et al., Respondents, v CITY OF NEW YORK, Appellant. (And Other Actions.)

First Department, September 15, 2011

APPEARANCES OF COUNSEL

*Mauro Lilling Naparty, LLP*, Great Neck (*Richard J. Montes, Barbara D. Goldberg*, and *Mitchel Ashley* of counsel), for respondents.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Scot C. Gleason, Elizabeth S. Natrella, Leonard Koerner, Christopher G. King*, and *Carrie Noteboom* of counsel), for appellant.

## OPINION OF THE COURT

MANZANET-DANIELS, J.

These consolidated actions are for personal injuries and wrongful deaths allegedly arising from plaintiffs' exposure to hazardous substances emanating from the Pelham Bay landfill in the Bronx. On a previous appeal, affirming the denial of defendants' motions to dismiss, inter alia, for failure to state a cause of action, we determined that plaintiffs' expert evidence did not require that a hearing be held in accordance with *Frye v United States* (293 F 1013 [DC Cir 1923]) (32 AD3d 91, 103-108 [2006], *affd* 9 NY3d 825 [2007] ["*Nonnon I*"]), ruling that "neither the deductions of the expert epidemiologists and toxicologists, nor the methodologies employed by them, in reaching their conclusions [are] premised on the type of 'novel science' implicating the concerns articulated in *Frye*" (*Nonnon I*, 32 AD3d at 103). Defendants now move for summary judgment in all nine actions, asserting that the evidence fails to show an increased cancer incidence caused by hazardous chemicals emanating from the landfill. We disagree, and affirm the order appealed from.

The now inactive 81-acre Pelham Bay landfill is owned by the City and was operated by the Department of Sanitation (DOS) beginning in 1963 for the disposal of 2,600 tons of municipal solid waste per day. Over the years, surrounding residents complained about odors and the improper and illegal dumping of hazardous materials and industrial waste from corporations in the area. The landfill was ordered to close on December 31, 1978.

In March of 1985, the City commenced an action under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 USC, ch 103, § 9601 *et seq.*) against 15 corporate defendants. The City claimed that the corporations had illegally disposed of industrial and chemical

waste containing hazardous substances at the landfill, contaminating the groundwater and threatening drinking water supplies. As a result of the suit, the City was awarded millions of dollars for the costs incurred in remediating the site and for natural resource damages (*see City of New York v Exxon Corp.*, 766 F Supp 177, 197, 200 [SD NY 1991]). In 1983, the landfill was classified as an "inactive hazardous waste site," which means that a significant threat to the public health or environment exists, and that action is required (*Nonnon I*, 32 AD3d at 93).

In 1985, DOS signed a consent decree with the State Department of Environmental Conservation (DEC), in which it admitted that it had allowed hazardous waste to be illegally disposed at the landfill while it was in operation, and that it had allowed leachate to enter the surface and ground waters in violation of state and federal standards (*Nonnon I*, 32 AD3d at 94; *see New York Coastal Fishermen's Assn. v New York City Dept. of Sanitation*, 772 F Supp 162, 163 [SD NY 1991]). DOS did not comply with the 1985 decree, as a result of which, in April 1990, DOS and DEC entered into a second consent decree, requiring completion of a remedial plan for cleanup of the landfill by 1995 (*Nonnon I*, 32 AD3d at 94).

Between 1991 and 1993, nine separate actions were brought against the City by residents of the neighborhoods closest to the landfill (*Nonnon I*, 32 AD3d at 94). In these actions, plaintiffs, children and adults and their families or executors, allege that extended exposure to hazardous substances emanating from the landfill caused the development of either acute lymphoid leukemia (ALL) or Hodgkin's disease (*id.*).[1]

On September 29, 2000, the City moved to dismiss the nine actions for failure state a cause of action, asserting, inter alia, that plaintiffs had failed to allege or establish a viable causal connection between the landfill and their injuries (*Nonnon I*, 32 AD3d at 95-96).

The motion court rejected the City's argument that the claims should be dismissed for failure to state a cause of action. The court found that the City's citation of reports pertaining to the Fresh Kills landfill, located on Staten Island, had no applicability to the case at bar, and that the City had offered no other evidence in support of its assertion that plaintiffs had failed to as-

---

1. This Court consolidated the nine actions for purposes of filing a single appellate brief and record.

sert a causal connection between the landfill and their injuries. The court thus denied the City's motion (*Nonnon I*, 1 Misc 3d 897, 898-900 [2003]).

This Court affirmed, rejecting the City's argument that the scientific methodologies employed by plaintiffs' experts were insufficient to establish that plaintiffs' cancers were caused by exposure to substances emanating from the landfill (*Nonnon I*, 32 AD3d at 103-108).

After this Court granted leave to appeal, the Court of Appeals affirmed on the ground that the City's motion had never been converted to one for summary judgment and plaintiffs, therefore, "were not put on notice of their obligation to make a complete record and to come forward with any evidence that could possibly be considered" (*Nonnon I*, 9 NY3d at 827). Noting that plaintiffs "suggest that due to the equivocal procedural posture of this case, they have not had the opportunity to submit all of their evidence relevant to a determination of causation," the Court of Appeals held that the City is "not now entitled" to dismissal of plaintiffs' complaints for failure to state a cause of action (*id.*).

On or about October 12, 2007, the City filed a motion for summary judgment.[2] Among other things, the City relied on a July 21, 2000 Department of Health (DOH) Public Health Assessment and a June 1, 1993 Woodward-Clyde Baseline Risk Assessment pertaining to the landfill. The 2000 report discussed potential contaminant exposure pathways and the results of two epidemiological studies conducted by DOH's Environmental Epidemiology Unit, a 1988 study of childhood leukemia and a 1994 DOH cancer incidence study. The 1988 study, a statistical comparison of the incidence of childhood leukemia among children in Bronx districts 4 and 6 during the period from 1974 through 1985, as compared to New York City as a whole, found "scant evidence" of an increased incidence of childhood leuke-

---

**2.** The City filed the same motion for summary judgment in all nine cases. However, unbeknownst to the City the eight cases other than *Nonnon* had already been dismissed by the Clerk of the Court, apparently due to a misapprehension about the applicability of *Nonnon I* to the eight related actions. The City and plaintiffs' counsel thereafter stipulated to the applicability of *Nonnon I* to all of the actions and to reinstatement of the eight related cases that had inadvertently been dismissed. The City then moved for summary judgment in the eight related actions, relying on the motion for summary judgment previously filed, dated October 12, 2007.

mia in the community adjacent to the landfill.[3] The 1994 DOH study contained the following statistically elevated findings: the annual incidence of lung cancer in women; the cumulative incidence of colon cancer and leukemias in men; and the cumulative incidence of kidney cancer among residents living closer to the cancer than further away. The authors of the study determined, however, that these findings did not present a pattern consistent with potential exposures from the landfill. While acknowledging that "one of the most well documented chemical exposures associated with leukemia is benzene," the authors concluded that there was no evidence of cancer patterns consistent with exposure to the landfill, and that exposure levels were likely too low to result in a detectable increase in cancer rates.

The 1993 Woodward-Clyde report discussed exposure pathways and noted that for area residents, both adults and children, the potential carcinogenic risks posed by inhalation of volatile organic compounds (VOCs) were below the risk level considered negligible by the Environmental Protection Agency (EPA) in setting cleanup goals under Superfund. The potential carcinogenic risks posed by incidental ingestion and dermal absorption from landfill soils were elevated for both workers and youth trespassers, but within the acceptable risk levels used by EPA in setting Superfund cleanup goals.

The City relied on the affidavit of Dr. Kara Kelly, M.D., a pediatric oncologist, who concluded that "no known medical or scientific basis exists for plaintiffs' claim that exposure to chemicals in the Pelham Bay Landfill, assuming such exposure occurred, caused them to develop ALL."

The City also relied on a new affidavit from its expert Dr. Jonathan Borak, M.D., who opined that no causal link between proximity to the landfill and plaintiffs' cancers could be scientifically established. Dr. Borak claimed, based on a review of the scientific literature, that there is no credible evidence linking childhood ALL to any specific chemical.

Plaintiffs, in opposition, relied on the evidence contained in the prior record on appeal (discussed extensively in this Court's opinion in *Nonnon I* [32 AD3d at 97-100]), as well as new affidavits from experts Dr. Neugebauer, Dr. Trainor and Dr. Land-

3. The study noted that while "excesses" in overall leukemia rates were not found, two findings indicated a possible increased incidence of childhood leukemia, including a statistically significant excess of cases reported in district 4 in the year 1984, and an excess of cases in 4 of the 162 census tracts in districts 4 and 6.

zkowsky, and the affidavit of a new expert, toxicologist and bio-statistician Dr. Bruce K. Bernard.

Dr. Richard Neugebauer, an epidemiologist, opined that persons residing in close proximity to the landfill experienced higher incidence rates of acute lymphoblastic leukemia as compared with persons residing further away from the landfill, and concluded that the landfill "is, more likely than not, a cause of the increased rates of childhood leukemia among area residents."

Dr. Neugebauer's study defined four rings, or bands, located 8,000, 12,000, 16,000 and 20,000 feet, respectively, from the landfill center. He obtained, from the cancer registry, the age, gender and race breakdown in each of the census tracts.[4] To evaluate whether ALL incidence was elevated as a result of proximity to the landfill, Dr. Neugebauer calculated childhood ALL rates in each of the rings. Using indirect standardization to adjust for age, gender, race and location of the population north or south of the landfill (all possible confounding variables), Dr. Neugebauer compared the rates of ALL in each of the three bands closer to the landfill with the rate in the band furthest away, Band 4.[5]

When these adjustments were made, the rate of childhood ALL in Band 1 was more than fourfold higher and statistically significantly greater, with a SMR of 4.05, than the rate among persons in Band 4. The rate of childhood ALL among persons in Band 2 was similarly substantially and statistically significantly elevated, with an SMR of 5.2, as compared to persons in Band 4. (The SMR for persons living in Band 3 as compared to Band 4

4. The City complains that it lacked access to Dr. Neugebauer's data. Dr. Neugebauer stated that he obtained the relevant information regarding childhood ALL cases from the cancer registry and the City certainly cannot dispute that it had access to this same data. Dr. Neugebauer's affidavit also describes the manner in which he defined the four bands used in his proximity analysis, and the adjustments made to the data to account for age, gender, race and location, all standard adjustments. Dr. Neugebauer states that he obtained data concerning the size of the pediatric population in each of the census tracts and the age, gender and race breakdown from publicly available data from the U.S. Census Bureau, information equally available to the City. Dr. Neugebauer stated that he presented standardized morbidity ratios (SMRs) with a 95% confidence interval. The information furnished by Dr. Neugebauer regarding his methods and data was sufficient for another expert to attempt to replicate his results.

5. Dr. Neugebauer noted that a judicial ruling prevented access to the same type of data for the county of the Bronx, as a whole, and for the remainder of New York City, precluding comparison to the rates in New York City as a whole.

was 1.95.) Dr. Neugebauer noted that the probability that this pattern of increases in rates with increasing proximity to the landfill arose from random error was 1 in 10,000.[6]

Dr. Neugebauer opined that in this case proximity analysis was the "optimal design," with distance from the landfill a proxy for the measure of exposure. Dr. Neugebauer noted that numerous epidemiological studies had investigated a possible disease excess around a point source of contamination by drawing concentric rings at increasing radial distance from the source and by obtaining data on the number of cancer cases per ring. Dr. Neugebauer stated that the superiority of this type of proximity analysis was "well-established." If the test for a linear trend was statistically significant, the proper conclusion is that a dose-response relationship exists.

Dr. Neugebauer also reanalyzed the Borak study, using six bands rather than seven,[7] extending four miles from the landfill center, and concluded that Borak's data also showed that the risk of ALL increased with proximity to the landfill.

Plaintiffs also relied on the affidavit of Dr. Bruce K. Bernard, an expert toxicologist and biostatistician. In order to determine the general plausibility of a cause-and-effect relationship between an increase in the observed frequency of childhood ALL and exposure to chemicals emanating from the landfill, Dr. Bernard analyzed Dr. Neugebauer's findings using the evaluation scheme propounded by Sir Austin Bradford Hill, a well-known epidemiologist and biostatistician. Hill's approach involves analysis of nine factors: (1) strength of association, (2) consistency, (3) specificity, (4) temporality, (5) biological gradient, (6) biological plausibility, (7) coherence, (8) experiment, and (9) analogy.

Dr. Bernard found that strength of association was clearly demonstrated by comparisons between Band 1 and Band 2 versus Band 4, showing a very significant relationship between

---

**6.** An SMR of 1.0 would indicate that a given band nearer the landfill has approximately the same cancer incidence rate as the band furthest away; an SMR greater than 1.0 indicates that a given band nearer the landfill has a higher incidence rate than the band furthest away. An SMR of 2.0, for example, would indicate that the incidence of cancer in the band is two times greater than the rate in the band furthest away from the landfill. An SMR with a 95% confidence interval that excludes one is statistically significant at $p \leq .05$.

**7.** Dr. Neugebauer excluded these outlying bands when he reanalyzed the data because Borak had excluded from Bands 6 and 7 those persons who did not reside in health districts 4 and 6, effectively eliminating 70% and 95%, respectively, of the population of those bands from his proximity analysis.

the incidence of childhood ALL and proximity to the landfill. Dr. Bernard found that Neugebauer's data showed internal consistency with regard to a causal relationship. He opined that the question of external reproducibility turned on the availability of other studies such as animal experimentation and epidemiological studies. Dr. Bernard opined that many of the chemicals known to have been dumped at and emanating from the landfill are well-known, potent human and animal toxicants, mutagens and carcinogens. Dr. Bernard noted that benzene is a leukemogen causing acute myelogenous leukemia and a known risk factor in multiple myeloma and ALL, all closely-related illnesses.

Dr. Bernard acknowledged that epidemiological data was more limited since environmental, occupational and health data limited exposure to these toxic substances. Dr. Bernard noted that human health data on these substances was largely derived through occupational exposures (which, by definition, would exclude children) and the rare accident or case of malfeasance. Dr. Bernard opined that within these scientific and moral constraints, available data was consistent with the cause-and-effect hypothesis.

Dr. Bernard opined that there was high specificity in the case of the causal relationship between the landfill and childhood ALL. He noted that the proposed causal relationship was limited by age (i.e., children), general disease type (i.e., cancer), specific system (i.e., hematopoietic), disease entity (i.e., ALL) and distance from the landfill (i.e., bands).

As to temporality, Dr. Bernard noted that none of plaintiffs were diagnosed with their illnesses before dumping began and all lived in close proximity to the landfill.

As to biological gradient, Dr. Bernard opined that the data demonstrated a direct dose-response relationship between exposure and the disease.

Dr. Bernard noted that "biological plausibility" (i.e., the notion that the proposed causal relationship should not seriously conflict with the breadth of generally accepted facts of the underlying science), was a question which turned on the etiology of childhood ALL, knowledge about chemicals in and leaching from the landfill, the potential human exposure to those chemicals and the known latency period for the development of childhood ALL. Dr. Bernard opined that available evidence supported a causal relationship between childhood ALL and exposure to a wide variety of substances, including ionizing radiation, pesticides, and organic solvents, such as benzene,

found to have emanated from the landfill. Dr. Bernard noted that etiologies believed to be associated with the induction of leukemias, including childhood leukemias, have as their common mechanism mutagenic effects on chromosomal tissue.

As to coherence, Dr. Bernard opined that he was unaware of a conflict between the proposed relationship (i.e., an increase in childhood ALL and the chemicals dumped in and around the landfill) and established scientific data.[8]

As to "experiment" (i.e., the notion that if A causes B, we should be able to decrease the occurrence of B by removing A), Dr. Bernard stated that he was unaware whether this data was available or had been analyzed.

Finally, as to analogy, Dr. Bernard noted that the Woburn case, although involving a different pathway, namely, drinking water, concerned exposure to the same chemicals involved in this case and the same medical sequelae.

Upon analysis of Hill's nine factors, Dr. Bernard concluded, with a reasonable degree of toxicological certainty, that it was more likely than not that exposure to chemicals emanating from the landfill was the cause of the increased frequency of childhood ALL observed in the plaintiffs.

Dr. Diane Trainor, Ph.D., an occupational and health and safety expert, studied the history of the landfill and analyzed possible exposure pathways. Dr. Trainor noted that it could not seriously be disputed that known toxic substances, long associated with ALL and Hodgkin's disease, had made their way into the air, ground and water, and that plaintiffs had been exposed to these substances through swimming in Eastchester Bay, eating fish from the bay, ingestion and dermal contact with landfill soils, contact with leachate seeps on sidewalks and jogging trails, eating items grown at a public vegetable garden adjacent to the landfill, and breathing the air in the vicinity of the landfill.

Finally, Dr. Philip Lanzkowsky, M.D., opined that numerous studies had found a statistically significant relationship be-

---

8. Dr. Bernard noted that he would have liked to have a better estimate of the actual exposure of the population to these substances, but noted that this was a "standard problem" in environmental exposure cases. Dr. Bernard noted that (1) data showed these substances to be emanating from the landfill at levels exceeding regulatory thresholds years after dumping had ceased, (2) well-known biodegradation rates existed for these substances, and (3) frequency dose-response curves, i.e., multiple points that demonstrate an increase in frequency of ALL the closer one gets to the landfill, existed for these substances.

tween exposure to benzene and ALL or Hodgkin's disease, and cited literature finding a relationship between chronic benzene exposure and leukemia.

The motion court denied the City's motions for summary judgment in all nine actions, stating that "in the instant motion, the City raises no new facts or law to warrant a departure from the prior holding of the Appellate Division, First Department [in *Nonnon I*]" (24 Misc 3d 1218[A], 2009 NY Slip Op 51513[U], *2 [2009]). We agree.

The *Frye* test is not concerned with the reliability of a particular expert's conclusions, but rather, with "whether the expert['s] deductions are based on principles that are sufficiently established to have gained general acceptance as reliable" (*Nonnon I*, 32 AD3d at 103 [internal quotation marks omitted]). General acceptance does not necessarily mean that a majority of the scientists involved subscribe to the conclusion, but that those espousing the theory or opinion have followed generally accepted scientific principles and methodology in reaching their conclusions.

As we observed in *Nonnon I*, epidemiology and toxicology are hardly novel sciences, but rather, well-established and accepted methodologies. In such a case, "the focus moves from the general reliability concerns of *Frye* to the specific reliability of the procedures followed to generate the evidence proffered and whether they establish a foundation for the reception of the evidence at trial" (*Parker v Mobil Oil Corp.*, 7 NY3d 434, 447 [2006] [internal quotation marks omitted]).

■ An expert opinion on causation should set forth a plaintiff's exposure to a toxin, that the toxin is capable of causing the particular illness (i.e., general causation), and that the plaintiff was exposed to levels of the toxin sufficient to cause illness (i.e., specific causation) (*Parker*, 7 NY3d at 448). Here, plaintiffs have submitted sufficient evidence, in opposition to the motion for summary judgment, to raise triable issues of fact as to whether exposure to toxins emanating from the landfill caused plaintiffs' ALL.

Epidemiology is the study of disease patterns in human populations. It uses studies "to observe the effect of exposure to a single factor upon the incidence of disease in two otherwise identical populations," seeking to associate unusual patterns of disease with environmental or biological risk factors (Black and Lilienfeld, *Epidemiologic Proof in Toxic Tort Litigation*, 52 Fordham L Rev 732, 755 [1984]). Epidemiological studies do not

provide "direct evidence" of causation in the sense of proving a particular plaintiff was injured by a particular substance; however, they provide compelling circumstantial evidence of cause-and-effect by demonstrating that exposure to a particular substance increases the incidence of disease in a given population. Epidemiological studies attempt to disprove the null hypothesis, i.e., the notion that there is no association between two studied variables (in this case benzene and childhood ALL), and to prove the alternative hypothesis, i.e., that the association between two studied variables is indicative of a cause-and-effect relationship. The epidemiologist attempts to ascertain, for a given risk factor, how much that factor will increase an individual's probability of contracting the disease. This magnitude is expressed in terms of "relative risk," the ratio of the number of occurrences of the disease in an exposed cohort to the number of occurrences in an unexposed one. If a given factor does not affect the rate of disease, its relative risk would be 1.0; if a given factor doubled an individual's chances of contracting disease, relative risk would be expressed as 2.0. Epidemiological evidence is critical in toxic tort cases to establish a causal relationship between a chemical substance and a set of symptoms or a disease (*see Jackson v Nutmeg Tech., Inc.*, 43 AD3d 599, 601 [2007] [there was no dispute that the plaintiffs were exposed DEAE, a chemical used in treating a building's heating and cooling systems, and that DEAE exposure is capable of causing injury]).

Dr. Neugebauer opined that the rate of childhood ALL in Band 1 was more than fourfold higher and statistically significantly greater, with an SMR of 4.05, than the rate among persons in Band 4. The rate of childhood ALL among persons in Band 2 was similarly substantially and statistically significantly elevated, with an SMR of 5.2, as compared to persons in Band 4. Dr. Neugebauer noted that the probability that this pattern of increases in rates with increasing proximity to the landfill arose from random error was 1 in 10,000. Dr. Bernard similarly opined that the strength of association was clearly demonstrated by comparisons between Band 1 and Band 2 versus Band 4, showing a very significant relationship between the incidence of childhood ALL and proximity to the landfill.

Plaintiff's evidence of causation is sufficient under *Parker* (7 NY3d at 448) to establish an increased incidence of ALL as a result of substances emanating from the landfill.[9]

█ The City contends that it is impossible to establish specific causation because plaintiffs cannot quantify their exposure to any specific toxin. The City insists that in the absence of a specific dose-response analysis, plaintiffs cannot establish that their current ailments were caused by toxins emanating from the landfill. We disagree. In *Parker v Mobil Oil Corp.* (7 NY3d 434 [2006], *supra*), the Court of Appeals rejected this very argument. The Court recognized that in toxic tort cases it is generally difficult or impossible to quantify a plaintiff's exposure to a toxin, stating, "[I]t is not always necessary for a plaintiff to quantify exposure levels precisely or use the dose-response relationship, provided that whatever methods an expert uses to establish causation are generally accepted in the scientific community" (*Parker*, 7 NY3d at 448; *see Wright v Willamette Indus., Inc.*, 91 F3d 1105, 1107 [8th Cir 1996] ["We do not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains"]; *see also B.T.N. v Auburn Enlarged City School Dist.*, 45 AD3d 1339, 1340 [2007]). The Court of Appeals noted that in lieu of establishing causation through a dose-response analysis, an expert might, for example, rely on mathematical modeling that would take into account relevant factors in estimating exposure to a toxin, or compare the plaintiff's exposure to the exposure levels of subjects in other studies (*Parker*, 7 NY3d at 449).

Thus, so long as plaintiffs' experts have provided a "scientific expression" of plaintiff's exposure levels, they will have laid an adequate foundation for their opinions on specific causation (*Jackson*, 43 AD3d at 602 [internal quotation marks omitted]). For example, in *Jackson*, the court found that the plaintiffs'

---

9. However, for those plaintiffs suffering from Hodgkin's disease, the record does not contain epidemiological data specifically linking the development of that disease to substances emanating from the landfill. Plaintiff's expert Dr. Landzkowsky cites an article entitled "Chronic exposure to benzene as a possible contributory etiologic factor in Hodgkin's Disease," but does not discuss the findings of the study or otherwise address the strength of the association between the incidence of Hodgkin's disease and exposure to benzene. We are thus constrained, as discussed below, to dismiss the claims of the two plaintiffs suffering from Hodgkin's disease.

expert had laid a sufficient foundation for his opinion on causation where, inter alia, the expert was directly involved in the investigation of the potential health consequences of the underlying incident; coauthored a report based on the investigation and research that had been published in a peer-reviewed medical journal, comparing the facts of the incident to those recorded in other studies; and opined that the manner in which DEAE had been fed into the steam system prior to the leak caused concentrated levels of the toxin to be released and that plaintiffs' symptoms were caused by DEAE exposure in a building.

Here, Dr. Bernard opined that the strength of the association was consistent with a cause-and-effect relationship between the landfill and childhood ALL and that the data demonstrated a direct dose-response relationship between exposure and the disease. He further opined that the available evidence concerning "biological plausibility" supported a causal relationship between childhood ALL and exposure to a wide variety of substances, including ionizing radiation, pesticides, and organic solvents, such as benzene, found to have emanated from the landfill. Dr. Bernard noted that etiologies believed to be associated with the induction of leukemias, including childhood leukemias, have as their common mechanism mutagenic effects on chromosomal tissue.

Given that the City relied on the proximity analyses contained in DOH's 1988 and 1994 studies of the landfill, it must concede that proximity analysis is a recognized substitute for a dose-response analysis. Dr. Neugebauer explained that the purpose of his study was to test the hypothesis of DOH's scientific advisory committee that if an epidemiological study of the landfill were extended into the 1990s and specifically looked at ALL, it might show an increased risk of ALL with increasing proximity to the landfill.

Furthermore, and critically, in this case, the strength of the epidemiological data alone permits an inference of causation. The Federal Reference Manual on Scientific Evidence notes that courts have permitted an inference of specific causation where the relative risk in an epidemiological study is greater than 2.0 (see Green, Freedman and Gordis, Reference Guide on Epidemiology, in Federal Judicial Center, Reference Manual on Scientific Evidence, at 384 [2d ed]). "When the relative risk reaches 2.0, [an] agent is responsible for an equal number of cases of disease as all other background causes" (id.) Thus, a

relative risk of 2.0 "implies a 50% likelihood that an exposed individual's disease was caused by the agent . . . [and] permit[s] [the] inference that [the] individual plaintiff's disease was more likely than not caused by the [substance at issue]" (*id.*).

In this case, the relative risks in Bands 1 and 2 were 4.05 and 5.2, respectively, when adjusted for confounding factors, well in excess of 2.0. Thus, according to the Federal Reference Manual, at least as to those plaintiffs suffering from ALL,[10] the strength of the relative risk alone is a sufficient basis for a reasonable juror to conclude that the plaintiffs' illnesses were more likely than not caused by exposure to hazardous substances emanating from the landfill (*see e.g. DeLuca by DeLuca v Merrell Dow Pharms., Inc.*, 911 F2d 941, 958-959 [3rd Cir 1990]; *In re Joint E. & S. Dist. Asbestos Litig.*, 964 F2d 92, 97 [2d Cir 1992]; *In re Agent Orange Prod. Liab. Litig.*, 597 F Supp 740, 835-837 [ED NY 1984], *affd* 818 F2d 145 [2d Cir 1987], *cert denied sub nom. Pinkney v Down Chemical Co.*, 484 US 1004 [1988]; *Landrigan v Celotex Corp.*, 127 NJ 404, 419, 605 A2d 1079, 1087 [1992]).

The City's criticisms of Dr. Neugebauer's study go to the weight of the evidence, not its admissibility. As the Court of Appeals stated in *People v Wesley* (83 NY2d 417, 422 [1994]), possible infirmities in the analysis of the data, including the methods used to test statistical significance, go to the weight the evidence is to be accorded at trial.

█ While the strength of the epidemiological evidence, alone, is sufficient for plaintiffs to establish that substances emanating from the landfill are more likely than not the cause of childhood ALL, those plaintiffs suffering from Hodgkin's disease put forth no similar evidence. Thus, we are constrained to dismiss the claims of plaintiffs Nessen and Walsh.

Plaintiffs, residents of the neighborhoods surrounding the landfill, were exposed to toxins, including benzene, over a number of years, via air emissions and contact with contaminated soil and/or contaminated surface and ground waters. Each of the plaintiffs lived in close proximity to the landfill. They played in a park adjacent to the landfill, swam and fished in Pelham Bay, and ate locally grown vegetables. It is undisputed that over a period of several decades, known carcinogens were disposed of at the landfill. The presence of these carcinogens,

---

**10.** As indicated above in footnote 9, Dr. Neugebauer's epidemiological study pertains only to the increased incidence of childhood ALL with proximity to the landfill. It does not address Hodgkin's disease.

including benzene, as well as their concentration levels in the air, soil and surface and ground waters, is well documented. Indeed, the City admitted in various consent decrees that it had allowed leachate to enter surface and ground waters, and that the surface and ground waters had been polluted by these contaminants.

We recognize that in toxic tort cases it is always difficult to prove specific causation. But as plaintiff's expert toxicologist noted, this is a "standard problem" in environmental exposure cases. The Court of Appeals in *Parker* acknowledged this difficulty, specifically holding that "it is not always necessary for a plaintiff to quantify exposure levels precisely or use the dose-response relationship," provided that his or her expert uses acceptable alternative methods to estimate exposure to a toxin (7 NY3d at 448). Plaintiffs suffering from ALL have sufficiently demonstrated, through epidemiological and toxicological data, a connection between the landfill and their present illnesses, and are entitled to a trial on their claims that exposure to substances emanating from the landfill was the cause of their cancers.

Accordingly, the orders, Supreme Court, Bronx County (Larry S. Schachner, J.), entered on or about April 26, 2010 and April 27, 2010, which, respectively, denied defendant City of New York's motions for summary judgment dismissing the complaints of the Nessen and Walsh plaintiffs, should be reversed, on the law, without costs, the motions granted and the complaints dismissed. The Clerk is directed to enter judgment accordingly. The orders of the Supreme Court (Larry S. Schachner, J.), entered on or about June 18, 2009, April 26, 2010, and April 27, 2010, which denied defendant's motions for summary judgment dismissing the complaints of the plaintiffs other than the Nessen and Walsh plaintiffs, should be affirmed, without costs.

MAZZARELLI, J.P., SWEENY, RENWICK and RICHTER, JJ., concur.

Orders, Supreme Court, Bronx County (Larry S. Schachner, J.), entered on or about April 26, 2010 (*Nessen v City of New York*, Sup Ct, Bronx County, index No. 22410/92) and April 27, 2010 (*Walsh v City of New York*, Sup Ct, Bronx County, index No. 20800/92), reversed, on the law, without costs, the motions for summary judgment granted and the complaints dismissed. The Clerk is directed to enter judgment accordingly. Orders, same court and Justice, entered on or about June 18, 2009 (*Nonnan v City of New York*, Sup Ct, Bronx County, index No. 8576/91), April 26, 2010 (*Simpson v City of New York*, Sup Ct, Bronx County, index No. 12648/91; *Ariso v City of New York*, Sup Ct,

Bronx County, index No. 15474/92; *Phillips v City of New York*, Sup Ct, Bronx County, index No. 14920/92), April 27, 2010 (*Irizarry v City of New York*, Sup Ct, Bronx County, index No. 16388/92; *Corollo v City of New York*, Sup Ct, Bronx County, index No. 15687/92), and April 29, 2010 (*Parmigiano v City of New York*, Sup Ct, Bronx County, index No. 23354/92), affirmed, without costs.